**AIRPREP TECHNOLOGY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 90–459C.

United States Court of Federal Claims.

Feb. 28, 1994.

Edward J. McDonough, Jr., Springfield, MA, for plaintiff.

Jeffrey R. Davis, with whom were Asst. Atty. Gen. Frank W. Hunger, David M. Cohen, and James M. Kinsella, Washington, DC, for defendant.

## OPINION

BRUGGINK, Judge.

This action is before the court pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1988). Plaintiff's petition asks the court to overturn a default termination and to award plaintiff the contract balance. Trial was held October 25–28, 1993. For the reasons set forth below, the court concludes that default termination was improper and that plaintiff is entitled to recover part of the damages sought.

### BACKGROUND

During the time of the contract at issue, the Department of Energy, Morgantown Energy Technology Center ("METC"), located in West Virginia, was in the midst of a large project known as the Fundamental Fluidization Research Program ("FFRP"). The nature of that research is not relevant to this suit. As part of that project, METC anticipated the need for a fabric filter particle collection system, commonly called a "baghouse." A baghouse is a device that is designed to extract pollutants from an air stream, but in a dry atmosphere. These devices typically are placed at the exhaust end of a gas stream as a form of pollution control. The exhaust stream in question was to be pressurized and hot.

Specifications for a baghouse were prepared by EG & G, a private engineering consulting firm that acted "of counsel" to METC and prepared part of the solicitation for the baghouse. Airprep Technology, Inc., ("Airprep") responded with a technical and price proposal. METC considered the Airprep proposal to be the only one of approximately half a dozen submissions that was technically responsive, although it was priced substantially above what METC was initially prepared to pay. More money was obtained, and a contract was signed between the parties on September 30, 1987, for the lump sum of $135,650.

Robert Mellen is President of Airprep, a small family-held corporation. He is not trained as an engineer, but he has extensive experience with building baghouses. His company has built over 200 of them. The one sought by METC was average in size and complexity compared to others the company has built. According to Mellen, the specifications told him all he typically needs to know to design and build a baghouse. He was provided with the temperature of the gas, the volume of the gas stream, the type of particulate, the location of the baghouse in the system, and the pressure—positive or negative—under which the baghouse would operate. Positive pressure means the gas stream is being pushed into the baghouse by an "upstream" external force. Negative pressure draws gas through the baghouse from a "downstream" external force.

Mellen was the first witness to explain the operation of a baghouse, and his explanation was fundamentally unchallenged throughout the trial. The type of baghouse that Mellen designed for METC operates on basic principles of gravity and inertia to filter out the various pollutants that are present in the gas stream as particles. To convey these particles to the baghouse, the system must accelerate them. Otherwise, gravity would keep them from remaining suspended. The heavi-

er the particle, the greater the required acceleration. The exhaust gas stream therefore must be maintained at a sufficient velocity to ensure that the particulate reaches the baghouse.

The shell of the baghouse designed for this job was, roughly, a sheet metal box approximately eleven feet by eleven feet, made of 12 gauge steel sheets welded together. No struts or braces were built into the cube itself. The cube was large enough to accommodate 256 ten foot long filter bags mounted at the top in a metal grid. Wire cages provided a support to keep the bags from collapsing. A venturi at the top of each bag collected the clean air passing through the filter. The clean air entered an upper chamber, and from there the exhaust then exited into the atmosphere through a three-by-five foot opening.

Once inside the baghouse, the velocity of the gas would diminish dramatically, and, according to Mellen, pressure would drop as well.[1] The reason for this drop is that pressure is a function of the space available, as well as the velocity and volume of the gas. In a static environment, i.e., one in which no additional gas is entering, more space is available for a given volume of gas, and, accordingly, the pressure is lower. Even more relevant according to Mellen, however, is that the system is not static. Under normal operating conditions the gas would continue to move through the baghouse toward the three-by-five-foot opening at the top. Because the exit is larger than the entrance, pressure would not build up for the same reason that a balloon with a hole in it larger than the opening will not inflate.

Mellen went on to explain that, because the velocity of the gas stream would drop dramatically as it entered the larger space, the heavy particulate would tend to drop out. The velocity would no longer be sufficient to overcome the effect of gravity. Particulate would drop to the bottom of the chamber, which consisted primarily of four pieces of triangular sheet metal forming a downward pointing pyramid. At the bottom of the pyramid was a rotating knife-gate that would open periodically to release accumulated particulate. It would open in such a way, not unlike a revolving door, that pressure did not escape.

Lighter particulate would, however, remain suspended. The filter media enclosing the wire cages would trap these pollutants when the exhaust crossed them in its search for the exit. To keep the bags from clogging and thereby blocking the ability of clean air to exit, the baghouse design provided a mechanism to generate periodic puffs of counter-pressure against the clean side of the filter bags. This sudden pulse of air would knock accumulated clumps of particulate off the bags. Because the particles would have a tendency to group together, they would then be heavy enough to fall to the bottom of the pyramid where they periodically could be removed through the knife gate.

Mellen expected the pressure within the main chamber of the METC baghouse to be approximately .2 pounds per square inch ("psi")[2] during normal operating conditions, regardless of whether incoming pressure was .6 or 1.6 psi, the range set by the specifications. The absolute highest pressure inside would be .6 psi. In order to meet the requirement of section 4.4.1 with regard to the ability of the baghouse to tolerate explosive conditions, Mellen elected the option of putting in two blowout doors. These were adjustable, but Mellen set them to blow out at a

1. William Ayers, Chief of the Project Engineering Branch at METC during this period, agreed in his testimony that the velocity would drop off inside the chamber, and that pressure would, for that reason, also drop. He disagreed that the decrease was significant.

2. Another measure of expressing pressure is in terms of inches of water pressure. The parties, particularly Airprep, were inconsistent in their use of these two methods.

During trial Mellen referred to the pressure in the lower chamber as "minute," in the range of .2 psi, or 6 inches water gauge. The most pressure that would ever be experienced in the chamber, he testified, would be 10 to 12" water gauge or 6 psi. He felt that even this slight pressure was more the result of the impediment created by the bags than due to remaining pressure that would otherwise be experienced in an eleven-by-eleven-foot chamber with a three-by-five-foot opening in the top.

pressure of approximately .8 psi.[3] Under Mellen's construction, therefore, the sidewalls would have to be able to contain an explosion or pressure buildup of up to .8 psi.

Mellen did not design the baghouse based on any sophisticated engineering calculations of what the internal pressure would be. The court was left with the impression after his direct and rebuttal testimony that the design was virtually completely controlled by the number of filter bags necessary to handle the volume of incoming gas. The higher the volume, the larger the number of bags, based solely on a ratio of approximately four cubic feet of gas to one square foot of fabric surface. In addition, Mellen made certain that the bottoms of the bags were not directly in the stream of the incoming gas.[4] The size of the chamber had to be adequate to slow down the gas sufficiently to permit gravity to do its work.

*Key Contract Provisions*

The parties' very different views of the lawsuit resulted in two correspondingly different foci for the trial. From the defendant's perspective, the focus was what the contract required in terms of the design of the baghouse. Accordingly, it justified termination in terms of a few key provisions of the engineering specifications of the baghouse.

The contractor was informed that the exhaust stream would come from a two foot diameter pipe. The specifications were also explicit as to a number of characteristics that METC wished to see in the dust collector and with respect to much of the material to be used. The overall construction and configuration was not specified, however, and no drawings were furnished as part of the solicitation. Instead, METC told the contractor the type of particulate to be encountered, and, generally, that it wanted

> a baghouse (including filters, filter cages, pressure boundary, and supports); baghouse hopper and dust hopper drain device; hopper heaters; pre-cut and shaped insulation with a metal protective jacket-

ing; bag cleaning mechanisms; a baghouse exhaust system; the required pipefittings for a baghouse process gas bypass system connection to the baghouse exhaust; the required penetrations for instruments; and instrumentation and controls for the baghouse cleaning system, the hopper heater system, and the dust drain system. . . .

*The specific design was left to the contractor.*

Section 3 of the Engineering Specifications is titled "Process Specifications." Section 3.5 informed the bidders as to the Operating Conditions:

> 3.5.1 Maximum Continuous Inlet Gas Volume—16,600 ACFM
>
> 3.5.2 Maximum Continuous Inlet Gas Temperature—400 degrees F
>
> 3.5.3 Inlet Gas Pressure Operating Range—0.6 psig to 1.6 psig.

The question of what was intended and understood by the last subsection occupied much of the presentation at trial. Defendant's primary argument throughout this litigation has been that section 3.5.3 reflected an operating pressure inside the baghouse itself. It follows from this view that plaintiff's design would have to be capable of tolerating such a pressure, magnified by any safety factors. It became apparent during trial that the government also had a related alternative view of section 3.5.3. That is that a contractor, aware of an inlet gas pressure of up to 1.6 psi, would also know that the baghouse itself would experience a virtually identical pressure. It was plaintiff's position throughout that as a matter of contract interpretation, this section related only to the inlet gas pressure, and that, as a matter of physics, an inlet pressure of 1.6 psi, given the dimensions and characteristics of the baghouse, would not result in an operating pressure inside the baghouse of anything close to 1.6 psi.

After hearing the testimony, it is clear to the court that the parties both understood

---

**3.** Mellen testified that it is standard practice to incorporate a safety factor in a design such as the baghouse. A typical factor is two to four times.

**4.** The specifications also called for a baffle to be placed inside the baghouse to deflect the gas stream downward, thereby minimizing risk of damage to the bags.

subsection 3.5.3 in its literal sense, to wit, that the gas stream coming into the baghouse would exert a pressure of 0.6 to 1.6 psi at the imaginary line separating the pipe from the baghouse. For reasons more fully explained below, however, it is also apparent to the court that most of the confusion that followed was caused by METC reading into this same subsection a performance or design requirement for the baghouse itself.

The only relevant performance requirements set out explicitly by the contract are in the following subsection:

3.6 Performance Specifications

3.6.1 Allowable Gas Pressure Drop— Change in pressure from the inlet of the baghouse through the outlet of the baghouse shall not exceed 1 psig.[5]

3.6.2 Collection Efficiency—The minimum collection efficiency shall be 99.9 percent when the inlet dust loading is 0.4 grains/ACF.

3.6.3 Duty—The baghouse shall be designed for continuous operation.

3.6.4 Noise Level—The baghouse unit shall meet or exceed OSHA industry noise level standards.

The government eventually terminated the contract for default before the contractor tendered the machine as operational. No evidence was presented, therefore, that the device furnished by Airprep did not meet any of these performance requirements, and in fact the government did not contend at trial that its default was based on the contractor's inability to satisfy this section.

The contract also contained certain other mechanical specifications that controlled the general design or overall performance of the machine. The most critical of these from the standpoint of defendant's construction of section 3.5.3 was section 4.4.1:

4.4.1 Pressure Rating—The baghouse shall be designed to operate under positive pressure, as specified under Section 3.5.3. The baghouse shell must be able to withstand an explosive pressure of 50

psig or be equipped with an explosion venting system designed in accordance with NFPA 68, "Guide for Explosive Venting."

The specifications called for the baghouse to be heated even when not in operation. This was done to prevent build up of moisture on the inside surface of the baghouse and to minimize the contraction and expansion of metal that would result from significant temperature changes. The specifications also called for precut and preshaped weather protective insulation to be placed on the outside skin of the main chamber. The insulation in turn was to be protected by jacketing made of stainless steel or aluminum.

Although defendant carries the burden of proof throughout the litigation, plaintiff's view of the case is relevant with respect to whether the government properly construed plaintiff's conduct as an anticipatory breach of contract, thereby justifying defendant's termination. From Airprep's perspective, the government breached the payment provisions of the contract, justifying its conduct. The contract contains the following standard provision regarding payment on fixed-price supply contracts:

33. 952–232–1 Payments (April 1984)

The Government shall pay the Contractor, after submission of proper invoices or vouchers, the prices stipulated in this contract for supplies delivered and accepted or services rendered and accepted, less any deductions provided in this contract. Unless otherwise specified in this contract, payment shall be made on partial deliveries accepted by the Government, if-

(a) The amount due on the deliveries warrants it; or

(b) The Contractor requests it and the amount due on the deliveries is at least $1,000 or 50 percent of the total contract price.

---

5. Mellen's explanation of why his design met the requirements of this section only make sense if the pressure drop contemplated is the one between the operating pressure in the main chamber and pressure on the clean side of the bags.

The drop there was from .2 psi to .0067 psi, according to Mellen. This interpretation of the specification was not challenged at trial, and Dr. Ayers found no quarrel with Mellen's similar explanation in Px 63.

*Contract Performance*

The Contracting Officer ("CO") assigned to the contract was Philip Evans. Evans's superior was Randolph Cooper. The CO's Technical Representative ("TR") was Joseph Mei. William Ayers, Chief of the Project Engineering Branch, was technically a colleague of Mei's, but because of his overall responsibility for construction and design of the FFRP, ultimately had more authority to assess the suitability of the baghouse. Mei and Ayers have engineering degrees; Evans and Cooper do not.

Airprep initially was given four months to complete the contract. For various reasons, the completion date was extended three times by modifications. The fourth bilateral contract modification put the completion date at February 28, 1989.

The contract required plaintiff to furnish six copies of nine different drawings within 30 days. In November 1987, plaintiff delivered what were referred to throughout the trial as "General Arrangement" drawings. These drawings were overall schematics of the baghouse prepared by Michael Siegel, an employee of Airprep. They did not satisfy the requirements of the contract with respect to instrumentation and control panel wiring. Mei wrote Airprep on November 25, indicating that the drawings were acceptable as general arrangement drawings, however, with certain exceptions. Plaintiff submitted modified drawings on January 12, 1988. The late delivery prompted the first extension of the completion date, to July 1, 1988. Based on METC's approval of the revised drawings, plaintiff submitted an invoice in the amount of $27,130 on February 22. Submission of that invoice was not challenged, and it was approved for payment by Mei and by Cooper. Payment was made on April 11, 1988.

Work came to a standstill in the spring of 1988. According to Mellen, he was contacted by telephone in March by Mei, who alluded in general terms to problems with the temperature of the gas stream. Mellen asserts, and METC witnesses did not deny, that the problem was lack of funding for a cooling tower. The result was that the gas stream would be coming through the pipe at approximately 500 degrees F. Mellen was told to put the project on hold till the temperature issue was resolved. Defendant had to do so before Airprep could complete its instrumentation design.

During the summer of 1988, Evans inquired of Airprep what it would charge if the following changes were made in the specifications:

Section 3.5.1 "Maximum continuous inlet gas volume—16,600 ACFM" shall change to "Maximum continuous inlet gas volume—25,000 ACFM."

Section 3.5.2 "Maximum continuous inlet gas temperature—400 degrees F." shall change to "Maximum continuous inlet gas temperature—500 degrees F."

Section 3.5.3 "The bags shall be made of Nomex material" shall change to "The bags shall be made of Fiberglass material."

He anticipated that "these changes may effect the production schedule of the system."

On June 9, 1988, Airprep responded that such a change would cost an additional $46,450, in part due to a substantial increase in the number of filter bags required and a concomitant increase in the size of the machine. The government delayed in responding, in part because Mei was on a temporary assignment away from METC for July and August. An internal memorandum of July 22, 1988, written on behalf of Mei, directed that the only change to be made was with respect to the filter material. The memo also noted that Airprep still had not complied with the contract requirement to furnish the balance of the drawings as well as the operating manuals.

Modification 002, signed in August by both parties, granted a time extension to October 30, 1988. There was no change to the contract price. Modification 003, signed at the same time, changed the bag material, also at no cost. Mellen did not receive notice of the decision not to go forward with the temperature and volume changes until the latter part of September. This delay prevented Airprep from doing any work on the project from February through September 1988. Actual construction began in mid-November. In January, the parties executed Modification

004, once again extending the completion date, this time to February 17, 1989. This date was extended by an amendment to the modification on January 18 so that February 28, 1989, became the final completion date.

As part of these modifications, the parties agreed that, in exchange for not preparing installation manuals, the plaintiff would install the equipment, rather than simply leave it on site. Plaintiff also agreed to arrange for a crane operator to hoist the baghouse onto its concrete pillars, so long as the government paid that expense. These changes also did not affect price.

During a telephone exchange between Mellen and Evans in January, Evans stated that METC wanted the system operational for testing in April. Mellen testified that as of that time he still needed information on where the government wanted certain controls located and what type of gauges it wanted to use, and that this lack of information kept Airprep from being able to complete operational manuals.

Mellen and two Airprep employees loaded the partially completed baghouse and associated materials on two trucks and took them to METC on February 16. They spent 65 man-hours over the next two and a half days erecting the machine. They had to make some adjustments because METC had placed the concrete support pad in a configuration different than what Airprep had been led to believe, and because the concrete pillars supporting the baghouse were 30 inches higher than Airprep anticipated, necessitating different installation techniques. At the site, Airprep welded together the three principal components of the heavy gauge box constituting the baghouse. These pieces had already been insulated and covered with lighter gauge (20 gauge) 4 × 8 sheets of stainless steel.

As of February 18, Airprep had delivered and installed the insulated baghouse, the rotary airlock, the knife gate valve, all the structural steel, all the catwalks, and all the ladders. Cages and bags had been sent previously, direct from the manufacturer.

When Mellen and his crew left, they had not connected the baghouse to the inlet gas pipe, and they had not installed the electronic controls, the filter bags, the outlet damper, the bird screen, or the coping strips (protective light-gauge stainless steel flashing). They had additional work to do on the exterior structural steel, including a final coat of paint. They also had final caulking to do, and they had not yet furnished operation manuals. Mellen testified that he expected to return "within a week or so after putting it up to finish it off." "[O]nce we had the answers on this February 17th meeting, ... we would have everything completed and finished by the 28th."

Mellen testified that there was no room on the trucks for the rest of the metal parts, and that final completion would take approximately another 100 man-hours of work. He also explained that he left the baghouse in a somewhat vulnerable position. The light gauge metal skin, placed over the insulation, was installed with a minimum number of non-rustproof screws. Coping had to be permanently installed over the seams in order to seal out rain. In addition, not all the exposed structural steel (i.e., non-stainless steel parts) were painted with rust-protective paint. Mellen felt that the temporary butyl weather strips would protect the machine for two or three weeks.

Before leaving METC, Mellen met with Mei, Evans, and others, including representatives of EG & G, on February 17. Ayers was not at the meeting. Mellen testified that it should have been apparent to METC personnel from the circumstances and discussion that Airprep was not through with its work. This was not contradicted. At the meeting, Mellen presented Evans with an invoice in the amount of $81,390, which represented about 60 percent of the contract price. Based on an earlier telephone conversation in which he had told Evans without objection that an invoice would accompany the delivery, Mellen assumed he would get another partial payment. Thus began a series of confusing or misleading exchanges, most originating with the government, that ultimately led to a breakdown of the relationship between the parties.

At the meeting following partial installation, Mellen asked for "prompt payment."

Evans responded that the invoice would go through the acceptance process and would be paid within five days. No such representation was required by either the contract or common sense. The contract permitted partial payments only upon acceptance of the delivery. Part II, section 33. The normal acceptance and payment process was too complicated to be accomplished so quickly, particularly in view of the fact that virtually the entire baghouse was delivered. The statement was optimistic at best, and certainly caused later confusion. Nevertheless, although the evidence is somewhat equivocal, the court is satisfied that Mellen understood at the time that Mei or Evans would do an inspection of the equipment before they approved the invoice. Minutes of the meeting written by F. Cassidy, an EG & G employee, reflect that "Mr. Evans stated that an inspection report is required before the invoice is signed off. Mr. Mei indicated that this report would be signed off by him as a COTR responsibility."

> Cassidy's notes reflect that the
>
> equipment received was essentially the filter shell without valves, ducting, and controls. Air Prep stated it did not know the control requirements, so this meeting was held to:
>
> * Review the components that were received with the shipment.
> * Review the hardware requirement to complete the purchase.
> * Define responsibilities for work and equipment required to complete the contract.

The notes indicate that the parties understood that the equipment had to be tested, and that eight weeks "are allowed to put the unit together and test it, per the original contract." This time period is consistent with Mellen's testimony that he understood from Evans that the baghouse had to be complete for testing in April.

The notes also contain what may be inconsistent statements or expectations of the participants. Mellen is recorded as expecting payment for the equipment already delivered; Evans recites that payment could not be made before the invoice was signed off,

and the invoice could not be signed off without an inspection.

Another EG & G employee, Mr. Lunifeld, apparently led a discussion on instrumentation, control, and operation. Cassidy's notes reflect that it covered sixteen subjects. Most of the discussion consisted of clarifications by METC of various uncertainties as to control devices and by Airprep as to the performance of the baghouse. One item contained in the notes is that the "filter was designed to contain $\pm 20$ inches of water pressure. The specification called for 40 in $H_2O$ "pressure." 20 inches of water pressure is equivalent to approximately .7 psi mercury. 40 inches of water pressure is equivalent to approximately 1.6 psi mercury. Mellen states that this item was discussed after the meeting. "We were asked what the unit was constructed to withhold. I stated that our normal units are designed to hold plus or minus 20 inches watergauge pressure, but this one would, in all probability, exceed 40." The notes were not sent to Mellen right away. He received them on April 11, on a return trip to West Virginia.

Cassidy's notes conclude with the comments that Mellen agreed to provide whatever instrumentation was necessary to operate the filter, and that Lunifeld would generate a "product and instrument development" ("P & ID") chart showing the location of the instruments and transmit it to Airprep. Mellen testified that although there were subsequent discussions about a P & ID chart, he does not recollect ever getting one. Mellen explained also that at the conclusion of the February meeting Airprep still needed information about the type of gauges METC wanted, and the manner in which they were to be configured. He also testified that the tone of the February 17 meeting was friendly; no criticism was directed at the quality of the machine or at its timeliness. Neither Cassidy nor Lunifeld appeared at trial.

Mei and Evans explained at trial the normal process for accepting and paying for work, partial or complete. Typically, payment will not be made unless the invoice is approved by the CO and the TR. Their signatures on the invoice are the signal to the accounting section to prepare payment. The

CO and TR will not sign the invoice, however, until the TR or some designee such as EG & G has done a complete inspection of the goods delivered to ensure that they meet the specifications. In the present circumstances, there is no dispute that Mei approved the invoice for payment without doing any meaningful inspection. He simply saw the equipment.

The inspection in fact was conducted by EG & G, was not initiated until February 21, and lasted three days. At the end of that period, EG & G prepared a report that was sent to Ayers and two other individuals. It was not sent initially to Evans or Mei. Unfortunately, therein also hangs part of the tale. The report listed eight defects with the machine and three problems or potential problems.

Before the inspection report was completed, a major disagreement arose between Mellen and personnel at METC when payment was not forthcoming. Mellen called Mei around February 23 and pressed him hard for payment. Mei was sufficiently intimidated by the call to abandon his normal procedure and approve the invoice without an inspection report. Evans also signed off on the same day. Mellen called Evans at least once during this period and was told that Mei had signed the invoice and that the check would be forthcoming, although there was no discussion about approval of the invoice. The invoice took a few days to clear the accounting section, however, and before the process was finalized, Evans had heard about the EG & G report. He instructed the accounting section not to cut a check. Mellen called again, however, armed with the knowledge that the invoice had been approved by virtue of a call to the accounting section. Mellen got what he felt was a disingenuous response from Evans.[6]

METC eventually told Mellen that the inspection had uncovered a problem, although it never gave him a copy of the EG & G report or the various internal memos that it spawned. On March 15, Evans wrote Mellen a six-page letter outlining the various deficiencies identified in the inspection report. The deficiencies alleged fell into a number of categories. Because defendant has the burden of proof on the propriety of default, the court will focus on those items that received some direct mention at trial. Evans wrote of the lack of drawings and manuals, the apparent failure of exterior ladders to meet OSHA standards, and the apparent failure of insulation to meet the specifications; he also made many comments about the baghouse itself. The most important of the latter comments related to operating conditions:

> 3.5 Operating Conditions. You have indicated that the delivered baghouse was designed for a maximum gas pressure operating range of 20 inches of water. This does not meet the maximum specified range of 44.3 (1.6 psig) inches of water.

Numerous other items were listed, but many were the result of an asserted lack of information or drawings.

Evans recites in his summation that

> Based on the preliminary inspection of the items delivered, your failure to supply the required drawings and manuals, and your indication that the delivered baghouse has been designed and fabricated with a gas pressure operating range of 20 inches of water versus the 44.3 (1.6 psig) inches of water specified in the contract, this office is concerned with your ability to fully comply with the requirements of the contract....

> In addition, you are advised that a contract completion date, including delivery of all items, of February 28, 1989, is now in effect. Notwithstanding this date, and your failure to complete contract performance as of this date, you have been afforded one more opportunity to complete contract performance. A Modification, M005, was sent to you on February 24, 1989, by which you have been given the opportunity to extend the contract performance until April 28, 1989. However, you

---

6. Mellen's reaction is understandable. A clerk in the accounting office told him that Evans had put a hold on the payment. With that individual on the line, Mellen called Evans, who, unaware of the clerk, said there was no problem and that payment would be forthcoming. This call precipitated an immediate deterioration in the relationship between the parties.

must sign and return this modification by March 29, 1989.

Mellen responded on March 22 in a six-page letter, with attachments. With respect to drawings and manuals, the letter indirectly suggested that the Paragraph 2.3 drawings and manuals could not be furnished until more information was received from METC. At trial, Mellen explained that he still did not have the P & ID drawings from Lunifeld to enable fabrication of the controls.[7] The letter also asserted that the drawings required by specifications 4.6 and 4.7 were in fact furnished. The letter enclosed what appear to be shop drawing details. These drawings may be the ones to which Mellen referred in his letter as modifications. The letter also accurately reflected that the government caused delay in delivery of drawings and manuals for several months while deciding whether to change temperature requirements and what type of dampers it wanted.

With respect to "Basic Design," Airprep's March 22 response recited the following:

a) Filter bags have been delivered and signed as received.  b) Ground straps. Refer to Paragraph 4, Mechanical Specification, subparagraph 4.1 through 4.1.8 no ground straps are specified.  c) Hopper heater straps are already installed in hopper of unit.  d) Bag cleaning mechanism, delivered except for control panel. Refer to meeting held on 2/17/89.  DOE could not provide information as to location of main control box, whether to be inside or outside with baghouse. Bag cleaning controls are to be located inside the main control box. (No invoice was issued for the control panel.)  e) Exhaust System Including Bypass, discussed at meeting held on 2/17/89. The bypass system would again be modified to eliminate unwanted ductwork.  f) All controls were not delivered nor were they billed for.

Mellen responded in the letter to all the other points raised in Evans's March 15 letter. He asserted that the ladders did in fact

meet OSHA standards, but agreed to replace them anyway. The failure to include flanges was explained as a temporary result of the government's failure to specify what type of dampers would be used. Mellen also offered to swap the drive motor for the rotary lock if it did not conform to specifications. Mellen addressed most of the mechanical comments by providing more information, by asserting that no deficiency existed, or by challenging the government's assertion that the item was called for under the specifications.

The most critical difference between the parties noted in the letter has to do with section 3.5, operating conditions:

You have misinterpreted the 20″ water grade [sic]. At the meeting the question was asked and I replied that the unit would hold more than 20 psig. (See enclosed engineering info on this subject).

At trial, Mellen explained that his dispute was with the government's underlying assumption that the operating pressure inside the baghouse was 1.6 psig, or 44.3″. The statement in the letter that Mellen had represented at the meeting that the baghouse could hold more than 20 psig was supported at trial by Mr. Mei. Mellen testified, however, that what he meant was 20″ water gauge: "The machine would be designed to filter out particulate through its range of plus or minus 20 inches, but because of the way the unit was constructed, it could handle higher water gauge pressure than that as far as the filtration was concerned." In other words, as on numerous occasions, the parties were talking at cross purposes. Mellen was explaining that the filters themselves would normally operate at 20″ of water gauge. They could tolerate up to 40″. The filters themselves would have a relatively low failure pressure compared to the structure of the baghouse itself.

METC personnel apparently understood Mellen to be giving assurances about the structural integrity of the chamber itself, which is not surprising. Mellen certainly

---

**7.** A letter from Mei dated March 7 the previous year furnishes what Mei describes as a "sketch and description of the control system." At trial, Mei referred to this as the P & ID drawings. It is difficult to understand how they could have

been P & ID drawings, since the parties agreed nearly a year later that drawings were still needed. Mellen stated that the March 7 information was insufficient because the temperature of the exhaust gases was still an issue in 1988.

added to the confusion by sending calculations that did in fact relate to the chamber itself, and not the filter medium. The information Mellen included was prepared by Louis Zglobicki, a mechanical engineer subcontracted by Airprep. The notes attached are confusing at best. As stated by Zglobicki, the problem was the calculation of "stress, (in psig), on the vertical weld of the baghouse skin due to a 1.6 psig pressure acting on the inside of the section." Three assumptions were made in the calculations: that "Pressure is contained within the structure," that the pressure was 1.6 psig, and that "Walls are rigid." The first two assumptions are inconsistent with Mellen's general explanation of how the specifications should be read. The device was open, and the inlet pressure of 1.6 psig maximum would dissipate quickly inside the baghouse, according to Mellen. Presumably Zglobicki was accommodating METC's view of the matter. At trial, Ayers questioned the third assumption, saying the skin would not be entirely rigid; rather, that it would experience slight flexing. In any event, the figure Zglobicki came up with as the "maximum allowable internal pressure" was 30 psig. Ayers explained that he felt the calculations were meaningless in view of the incorrect assumption built in.

On March 28, Ayers and Mei sent an internal memo to Evans, rebutting Airprep's letter. With respect to section 3.5, the following was recited:

> Perhaps METC did misinterpret Mr. Mellen on the design pressure for the bag house. However, the engineering calculations enclosed with the letter do not represent the governing stress in the shell design. Assumption No. 2 is not valid (i.e. the plate is rigid) and both membrane and bending stresses must be considered. Accounting for these stresses will result in a significant reduction in the indicated design pressure. As a consequence of the review of this engineering design approached [sic], METC has serious concerns on the structural integrity of the entire unit and will now request a formal review of all engineering design documents.

This memo was not sent to Mellen.

Modification 005, sent to Airprep on February 24, proposed an extension of the contract performance date to April 28. On March 29, Mellen returned M005. Although he signed it, Mellen made a modification to METC's proposal. He deleted a reference to "delivery and installation of all equipment and completion and delivery of all reports no later than April 28, 1989." He substituted, "completion date to be set after solution to letters dated D.O.E.: March 15, 1989, Air Prep Tech: March 22, 1989." Mellen testified that, in view of conversations that he and Evans had had, he was reluctant to agree to provide "all" equipment without some limitation to what was required under the original contract. Airprep had agreed to amend the contract to provide the labor to hook up the baghouse, but not the wiring, electrical conduit, cranes and other equipment necessary. METC never executed either form of the modification.

On April 4, Evans sent a cure notice to Airprep. Evans catalogued Mellen's responses to the March 15 letter, acknowledged the validity of some responses, and highlighted a number of areas in which there was still disagreement or non-performance. Airprep was given 30 days to cure. With respect to control drawings and operating and instruction manuals, the letter recited that "[t]he contract provides an engineering specification which clearly sets forth the specifics to fulfill the requirements for the drawings and manuals." This statement cannot be correct. METC changed the elevation and orientation of the baghouse after the specifications were drawn up, and dithered for the better part of a year as to whether it would change the temperature, volume, and composition of bag requirements. It would appear, however, that, based on conversations and instructions over the six months preceding March 1989, most of the uncertainties were eliminated. Nevertheless, the court cannot find that all uncertainty was eliminated. Specifically, the reliance on the March 7, 1988, "loop drawing" as eliminating all ambiguities about the electrical controls appears to be misplaced.

The most critical of the remaining deficiencies listed in the cure notice continued to be

the parties' disagreement about operating pressure. As explained below, the remaining deficiencies either were not relied on by the Government as part of its trial presentation, or could be characterized as "curable," or may have resulted from the excessive time between delivery on February 17 and METC's later examinations of the baghouse. As to pressure, Evans wrote that

> The engineering calculations enclosed with your March 22, 1989, letter do not represent the governing stress in the shell design. Assumption No. 2 in your analysis is not valid (i.e., the plate is rigid) and both membrane and bending stresses must be considered. Accounting for these stresses will result in a significant reduction in the indicated design pressure. As a consequence of the analysis of this engineering design, serious concerns have been raised on the structural integrity of the entire unit. A formal review of all engineering design documents you are required to deliver will be made to determine compliance with specifications.

Evans also wrote that METC's dissatisfaction with assurances about internal pressure affected the mechanical specifications such as those relating to the blowout doors: "[U]ntil the actual design pressure of the unit is established, it is impossible to assess the adequacy of the mechanisms."

There was no other contact between METC and Airprep personnel between March 29 and Airprep's receipt of the cure notice. After he got it, Mellen made another trip to the METC facility in Morgantown on April 10, 1989, taking Zglobicki with him. Cooper, who also held a contracting officer's warrant, handled the discussions on behalf of the Government. Ayers also attended. Mellen explained at trial that he viewed the purpose of the meeting as resolution of disagreements remaining from the March 15 letter, primarily as to the internal operating pressure of the baghouse. The parties met for three hours, but none of the witness-attendees provided much detail as to what was discussed.

As a result of the meeting, Cooper wrote an upbeat letter to Mellen on April 11, holding out the possibility of satisfactory resolution if Airprep could furnish drawings and calculations that would demonstrate the machine's ability to meet specifications. No detail was provided as to deficiencies, nor was any reference made to any representations Mellen may have made. Cooper offered to make a $68,520 progress payment if the calculations showed a "design capacity in compliance with the applicable engineering codes and standards incorporated into the contract." Cooper did not withdraw the cure notice, however, emphasizing that he would not do so unless assured by his technical people that the baghouse complied with specifications. Cooper stated that the "contract will be modified to incorporate the newly negotiated delivery schedule."

Mellen confirmed these representations in a letter sent on April 19. The letter refers to an intervening conversation with a Mr. Calloway, an METC employee, as to the meaning of Cooper's letter. Mellen summarized the conversation as discussing an obligation by Airprep to furnish drawings and calculations that Ayers and Zglobicki had agreed to: "Upon Mr. Ayers's review and his satisfaction that the delivered Baghouse will comply to the pressures needed, (1.6 psi with a safety factor of between 2. and 4.). We will open discussion for the rest of the deliverables along with a schedule for final completion of the contract." He cautioned, however, that "[c]ontract modification will be negotiated upon satisfactory completion of the above by both parties.... Airprep Tec[h]nology will hold in abeyance al[l] legal remedies concerning this matter...."

Considering the parties' fundamentally incompatible views, it is remarkable that the parties could have met on April 10 for the specific purpose of isolating differences and still emerge with any optimism that plaintiff could satisfy the government's concerns. Yet they did. This continuing phenomenon throughout the spring of 1989 must have resulted from the lack of engineering and legal sophistication of Mellen and Evans, their respective reliances on Zglobicki and Ayers to make substantive decisions on critical issues, and from Ayers's off-hand and peremptory manner. Ultimately, the blame for the miscommunication must be laid on

the government's persistence in misreading the contract.

The parties understood that the calculations Airprep was going to furnish to METC related just to the pressure issue.[8] Mellen testified that he did not consider completing work on the baghouse while the pressure issue was being debated because of "the tone of the letter of March 15th," specifically METC's concern for plaintiff's ability to perform the contract. According to Mellen, he was not asked at the April meeting to finish the baghouse pending satisfaction of Ayers's concerns, and he had no interest in investing more money if there was a fundamental disagreement about design of the baghouse.

Airprep was to furnish the final data before April 28 so that METC could consider it by May 5, the date fixed by Evans as the last time for responding to the cure notice. On April 26, Mellen wrote another somewhat baffling letter to Ayers dealing with the pressure question. More of Zglobicki's calculations were enclosed, along with an excerpt from the published standards of the American Society of Mechanical Engineers ("ASME") with regard to construction of pressure vessels.[9] In the body of the April 26 letter, Mellen writes that "pressure inside the baghouse will be zero psi with only the pressure drop across the filter media to be concerned with." On the face of it, this assertion is implausible, since the letter also refers to a positive pressure across the filter medium. At trial Mellen explained his statement:

I stated that the pressure inside the unit, as far as the 1.6, would not be 1.6 but in effect be cancelled out to zero between the top air plenum and the bottom air plenum because there's a hole to atmosphere on this and the pressure that the system would actually see, if any pressure, would be that which would be the operating parameters and that would never exceed 10 to 12 inches watergauge.

There is no question that Mellen's communications with METC added to the confusion. During trial, Mellen sometimes had difficulty explaining what he meant and what he said during contract performance. Part of the confusion was caused by his misuse of the term "psi." What emerges from trial and from a close reading of the documents and Zglobicki's deposition excerpts is nevertheless consistent in one critical regard. Airprep never deviated from its original position that 1.6 psi was the pressure felt in the pipeline and not in the baghouse itself. The lower pressure figures Mellen introduced reflected his consistent belief that pressure would drop dramatically once exhaust entered the chamber. Higher pressure rating figures reflected strength of material estimates. Airprep never accepted the assumption implicit in the government's continuing requests for assurances, namely, that the specifications meant that the "design pressure" of the baghouse would be at least 1.6 psi. Although the court has little confidence in Zglobicki's figures, in part because he admitted that they were partially incorrect, the court is persuaded that they are irrelevant in a contract sense.[10] Although Mel-

8. Cooper's letter of April 27, 1989, is substantially narrower than the list of deficiencies presented in the March 15 letter. Each of the items requested specific to the baghouse related to pressure.

9. At trial, plaintiff took the position that these standards are inapplicable to the baghouse. Mellen testified that he agreed to supply whatever Ayers believed he needed, and asked Zglobicki to furnish it. As Mellen wrote in the April 26 letter, he furnished the calculations and ASME excerpt despite not understanding "the need to supply this data." Ayers took the position that they did apply. Paragraph AG–121(h) excludes from coverage vessels "having an internal or external operating pressure (see AD–121.3) not exceeding 15 psi with no limitation on size (see

AD–300)." The parties' trial positions are somewhat inconsistent with their positions during contract performance, when METC took the position that internal pressure would be 1.6 psi, and the plaintiff at one point represented an pressure of 20 psi. Given the Government's litigating position that the operating pressure would be 1.6 psi, and proof from the plaintiff that pressure would be less than that figure, the ASME standards do not directly apply.

10. Only part of Zglobicki's deposition was introduced. At one point Zglobicki is asked, "Will it hold 20 psig?" Presumably this refers to the baghouse, as the preceding section is omitted. Zglobicki's answer, "definitely not," is puzzling, in view of his notes, which show a "max. allowable design pressure for material of inside skin"

len's imprecision or inaccuracies may have caused Ayers's concern, they were submitted in response to an illegitimate government inquiry.

An internal METC memorandum of the same date (April 26) reflects a telephone conversation between Mellen and Cooper, who by this time was acting as CO. Cooper reflects that Mellen told him that "the unit would never see the pressure specified since the unit vented to atmosphere." Cooper responded that "the CO would decide, based upon tech recommendations. I would verify that the unit would see the 1.6 operating pressure ..."

Two things are notable about this memorandum. The first is that the incompatibility of the parties' positions on internal pressure is clearly and succinctly expressed. The second is that it demonstrates that most of the previous negotiations, contacts, calculations, etc., were doomed to failure. They were incorrectly premised. The parties' respective views of the import of the "1.6 psi" language meant that Mellen could never satisfy Ayers's real concerns. Ayers was concerned that pressure in the vessel would be high, therefore the box itself had to be able to sustain an internal pressure of 1.6 psi, multiplied by a safety factor. Mellen's assurances that the internal pressure would be, alternately, "zero," ".2 psi," or "20" water gauge," therefore inevitably, and understandably, caused alarm.

After a "quick review" of Airprep's April 27 submission, Mei and Ayers reported to Evans that it was deficient in not furnishing certain information regarding pressure, safety factors, and stress calculations. They also took exception to Mellen's statement that

"the design pressure of the unit was 1.6 psi at 400 degrees F. This is not so and in fact METC repeatedly stated to Mr. Mellen that the design pressure would be some value higher than this pressure...." METC personnel may well have believed that the internal pressure would be 1.6 psi, and may have discussed that internally, but the documentation and trial testimony do not support the last sentence. Certainly the contract documentation does not.

Ayers also wrote another note to Evans on May 3, 1989, further commenting on the Airprep engineering calculations.[11] It was one page in length. He critiqued for the first time the methods Airprep used to calculate wind load on the legs. The calculations for the blowout doors were also incorrect, he said, as were calculations on stress in the chamber itself, which he found did not meet specifications, and "is not acceptable." Evans was told "we still need additional calculations to properly review and define the other problem areas in the bag house design. Please expedite delivery of this information." Evans was not an engineer, however, and, as he testified at trial, did not fully understand what the deficiencies were. He therefore may have been less than enlightened by such comments as "I can accept the [Airprep calculation] on the reinforcing C-channel for the inside skin as a worst case approach, although I would used [sic] a more refined moment of inertial, moment equation and centroid which include the inside skin as part of the reinforcing member."

On May 9, METC issued a Show Cause Notice. It was signed by Cooper. The notice recites that the April 27 submission did not answer METC's concerns as expressed in the April 4 Cure Notice. Airprep had failed

of 40,000 psi, at one point, and at another point, reflect a "maximum allowable internal pressure" of 30 psi. From the deposition excerpts, however, it appears that Zglobicki did not think he was being asked the same question that was answered in his notes. Further complicating an understanding of Zglobicki's deposition is that, from both Mellen and Zglobicki's perspective, operating pressure is the pressure drop across the filter medium. Zglobicki testified that the baghouse would not fail at 20" water pressure, which is above the 6" that Mellen felt it would normally experience. Zglobicki was asked a number of questions concerning whether the

baghouse should be designed to withstand, within a safety factor of two times, an internal pressure of 1.6 psi (i.e., 3.2 psi). He gave no clear answer, and his responses were not adequately explored. His testimony is of no help to defendant, and the court accepts it as support for plaintiff only to the extent that Zglobicki confirmed Mellen's explanation that internal pressure would drop off when the exhaust stream entered the baghouse.

**11.** Joint Exhibit 43 is dated March 5, 1989, but apparently month and day were inadvertently transposed, or put in military format.

to deliver remaining equipment and data, and that which had been furnished did not meet the specifications. No effort was made to itemize METC's old grievances, but four new "concerns" were raised: the method METC used to do wind-loading calculations was incorrect; the government's calculations with respect to the pressure relief doors were different than Airprep's; stress levels for the steel used in the dome construction appeared to METC to be above the limit for the type of steel used; and a visual inspection of the C channels revealed they were 15 gauge rather than the 12 gauge indicated in the shop drawing.[12] There had been no previous discussion of these items. Airprep was given until May 31 to respond.

In order to test his reading of the operating pressure requirements of the specifications, Mellen hired a consulting engineer firm. Bruce Thompson of Buonocore–Cashman Associates gave Mellen a brief report on May 22. No one from the firm testified, and the court is reluctant to interpret without assistance the part of the letter that assesses the inlet pressure. The thrust of the engineering firm's analysis, however, is that Airprep's baghouse design was consistent with a need to keep pressure from exceeding 6″ water gauge so that the filter bags would not be damaged. "[T]here is no reason to require a design pressure rating on the baghouse significantly above 9″." A fair reading of the letter is that Buonocore–Cashman, which, according to Mellen is expert at baghouse design, had no problems with Airprep's design meeting the specifications or practical necessities of operating a baghouse.

On May 25, Mellen wrote a four-page response to the show cause notice. He began by stating Airprep's underlying position that the calculations asked for by Ayers were not called for by the specifications. He repeats his prior assertion that section 3.5.3 means that "1.6 PSIG will be the maximum operat-

ing gas pressure introduced at the inlet of the filter house." He warranted that the

> unit was designed to handle that pressure that it would actually see along with the appropriate safety factors. The governing factor is the amount of pressure built up inside the baghouse during actual operation. Since the specifications clearly state that the back draft damper will in the open position at all time during operation, thereby eliminating any downstream restriction the pressure inside the unit will be that pressure as developed between the clean air and dirty air plenum. This pressure will be the amount of restriction that the filter media imposes on the gas stream as it flows through the baghouse from the inlet to the outlet.
>
> To fully understand this principle, paragraph ... 3.6.1 Allowable Gas Pressure Drop,—"change in pressure from the inlet of the baghouse through the outlet of the baghouse shall not exceed 1 inch PSIG". This specification is interpreted by this firm to mean that allowable restriction created by the filter media shall not exceed 1 inch PSIG.
>
> With this in mind, the unit was then designed for filter bag protection, meaning that when the pressure across the filter media goes above 8 to 10 inches water the bags will fail and the support cages may collapse....
>
> ....
>
> You state in your 'Show Cause' notice ... that the correct pressure for the relief latches on the door of the dirty air plenum should be 850 pounds force. If this situation were allowed, the filter media and the support cages would be destroyed long before the doors would release the pressure, therefore rendering the unit useless. To prevent this from occurring, the latches will be set to open at 9 inches water.

· · · · ·

---

12. The letter refers to a requirement of 20 gauge steel. Mellen understood the correct reference to be to the thicker 12 gauge steel for the main chamber. The notice also refers to the C channels as reinforcing members. Mellen testified that he designed the baghouse with C channels in order to create an elevated contact point for the light gauge exterior steel shell. His drawings indicate use of 12 gauge steel. Insulation boards filled the space in between. Mellen said that while the C channels might give the structure more strength, that was not the intent. He also explained that Airprep never uses 15 gauge steel, which is a special order product. Steel normally comes in even numbered gauges.

... [T]he normal operating pressure of .2 PSIG was used to determine the safety factor of the unit.

He asked METC personnel to explain their interpretation, if his was incorrect. Although the bulk of the letter addressed the pressure controversy, he referred to enclosed calculations that, according to Mellen, satisfied the wind load criteria.

Mellen's May 25 letter is the first cogent written explanation by Airprep of its position; however, it did not satisfy METC personnel. On June 5, Mellen called Cooper. In that conversation, Cooper announced that the contract was being terminated for default. He explained that the termination could be converted to one for the convenience of the Government if Airprep accepted a payment in complete settlement of $4,000. Mellen rejected that offer. Cooper then conceded that, if pressed, the Government would pay as much as $27,000. When Mellen asked if Airprep could recover the baghouse and still get that payment, Cooper refused, because METC wanted to complete the device. According to Cooper, METC would have been able to use the materials in a new baghouse, albeit one that did not perform at the specified level.

Although Cooper was negotiating with Mellen from the belief that nothing could be done with the device furnished by Airprep that would bring it into specification, he was unaware that, at the time of termination, Ayers had done an estimate "to bring baghouse into specifications." A set of calculations done by Ayers, dated June 5, was introduced. It reflects his view that it would cost an additional $104,100 to complete the baghouse in accordance with the specifications. Ayers testified that he prepared the notes on the assumption that spending the money would fix all the problems. It is noteworthy that none of Ayers's proposed repairs addressed the integrity of the welded box itself.

City Neon Co. had been engaged by Airprep to install the baghouse, at METC's expense. When it was not paid, City Neon sued Airprep. The resulting judgment

against Airprep led to a sheriff's sale of the baghouse to City Neon, which moved it to a field outside Morgantown. City Neon later sold it to Dayco Co., which tried, apparently unsuccessfully, to market it to Ashland Oil.

After default, METC resolicited the same specifications.[13] Although it received bids, they came in higher than the amount METC had allocated for the work, and no reprocurement contract was executed.

Photographs were taken by METC personnel of the baghouse in June 1989. A videotape was also taken of the baghouse in 1990. By then, it had been left lying unprotected in a field for more than a year and a half. The Government attempted to make much of the deteriorated condition of the baghouse. It had been left on its side, exposed to moisture. The court finds the videotape of little value, however, given the lapse of time and lack of protection. Airprep did not represent that the baghouse was sealed as of February 17. It designed the baghouse to be heated at all times, even when not operating, in part to prevent rust. Moreover, Mellen testified that although there was rust on the cast steel portions, many of the stains on the stainless steel sheets were not rust. They were discolorations from welding.

On December 15, 1989, Airprep submitted a certified claim to the CO asserting a breach of contract and seeking payment of the full contract price.

## DISCUSSION

■ The contract in this case gave the government the right to terminate for default in the event that the contractor failed to perform according to the contract terms within the contract period. The defendant has the burden at trial of proving that the contractor defaulted. *Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 764 (Fed.Cir.1987). In a case such as this, however, application of the burden of proof is a bit problematic. The parties do not dispute that Airprep did not complete contract per-

---

13. Cooper testified that Ayers raised the possibility of changing the inlet gas pressure specification to eliminate any possible confusion about what METC wanted. Cooper opposed the idea as possibly jeopardizing the government's position in potential litigation.

formance by the formally agreed upon contract date of February 28, 1989; it had yet to perform several items of work. Assuming for argument's sake that this circumstance shifted to Airprep the burden of going forward with evidence at trial to justify nonperformance, the court concludes for the reasons set forth below that the performance period was indefinitely extended by agreement of the parties, and that the gridlock that occurred thereafter was due to the government's insistence on a cardinal change to the contract. Thus Airprep did not default.[14]

■ Airprep had a contractual duty to proceed. It justifies its failure to do so in two ways. Initially, the court rejects plaintiff's contention that failure to make a second progress payment was an independent breach of contract by the government and an alternative ground for plaintiff to refuse to perform. Paragraph 33 of the contract provides that the agency "shall pay" for supplies delivered and accepted. Such a payment was made after METC approved Airprep's February 22, 1988 invoice for work done to that point was approved. Although Mei and Evans approved for payment plaintiff's invoice of February 9, 1989, in the amount of $81,390, the court finds that "acceptance" had not progressed to the point that an independent obligation to pay arose. As found above, Mellen understood that METC had to inspect the February delivery before approval for payment. It did not do so. The assurances that Mellen received concerning forthcoming payment were extracted under pressure. Moreover, Mellen found out about the internal approvals inadvertently. Under those circumstances, it was not inconsistent with the payment clause to, in effect, rescind the pre-inspection approvals and delay partial payment until inspection and subsequent approval. In any event, Airprep never demonstrated that mere failure to make partial

payment constituted an anticipatory breach of contract. It did not offer proof that its subsequent lack of completion was due to non-payment. *Cf. Northern Helex Co. v. United States*, 455 F.2d 546, 197 Ct.Cl. 118, 124 (1972) (finding that government's failure to make progress payments was a material breach where government had failed to pay for over a year and was several million dollars in arrears).

■ Despite other alleged deficiencies, the testimony and exhibits clearly demonstrate that the dispute over the pressure issue was what caused METC to reject the baghouse and Airprep to refuse to proceed further. Ayers required Airprep to submit the calculations that led to termination because he sought assurances that the baghouse would hold an internal operating pressure of at least 1.6 psi. Airprep thus had to demonstrate that the baghouse had a design pressure .6 to 1.6 psig, magnified by a safety factor. METC treated Airprep's refusal to assure it that the baghouse would perform according to its interpretation as a breach of contract.

Airprep justifies its failure to perform prior to the cure notice on the basis of a de facto suspension of work. Cooper testified that METC was willing to keep the contract alive well past the February 28 completion date if the parties could resolve the pressure issue. When he was asked whether, as of April, "[y]ou had a contract with no completion ·date?" he replied, "That is true." He conceded that the term "operating pressure" does not appear in the contract, but that he was nevertheless awaiting assurances from Airprep that it complied with METC's reading of section 3.5.3 as requiring an internal operating pressure range between .6 and 1.6 psig.[15] Mellen was incapable of giving those

---

14. It is therefore unnecessary to consider whether, even if the contractor had been in technical default, exercise of the default remedy was an abuse of discretion. *See Darwin Construction Co. v. United States*, 811 F.2d 593 (Fed.Cir.1983); Federal Acquisition Regulation 49.402–3(f).

15. Cooper testified as follows:
Q  But is that not exactly what you were proposing on your April 11 letter, that we proceed

and try to resolve these questions, and after we resolve them, we will then modify to incorporate.
A  Yes.
Q  So you were suggesting that we work the matter out with the pressure issue.
A  Yes.
Q  And if we do, then, we work out a schedule to finish, correct?
A  Yes.

assurances, however. He believed not only that METC was misconstruing section 3.5.3, but that the open-ended baghouse design and the blowout doors made it impossible to build up that level of pressure.

The practical effect of the parties' negotiations and METC's instructions to Airprep is that METC imposed on Airprep a new contract requirement that the baghouse be able tolerate an internal operating pressure of 1.6 psig or higher. Mellen did not provide clear assurances to METC that the baghouse could do so. If he was obligated to provide such assurances, METC then might have been justified in relying on its own analysis to force the plaintiff to demonstrate acceptability.

■ The changes clause of the contract gave the CO the right to order changes "within the general scope of the contract." Such changes obligate the contractor to perform and then seek compensation for the additional work. If the requirements that the government imposed on Airprep in this case were within the general scope of the contract, then Airprep was obligated to perform, even if the government misinterpreted the contract. A contractor has no right to stop work if the project to be constructed is fundamentally the same as the one it contracted to build. *Aragona Constr. Co. v. United States,* 165 Ct.Cl. 382, 391, 1964 WL 8634 (1964). A contractor is not, however, obligated to undertake "cardinal changes"—drastic modifications beyond the scope of the contract work. *Air–A–Plane Corp. v. United States,* 408 F.2d 1030, 187 Ct.Cl. 269, 275 (1969). The Court of Claims characterized such changes as those that "alter[ ] the nature of the thing to be constructed." *Arago-*

*na Constr. Co.,* 165 Ct.Cl. at 391. The question thus becomes, was METC insisting that Airprep perform beyond the limit of the general scope of the contract at the time of the default termination.

The initial step in this analysis is determining whether in fact the government's interpretation effected any change from what the contract called for; i.e., whether the contract required Airprep to deliver a machine capable of tolerating an internal operating pressure of 1.6 psig. Ayers's understanding of the key specification is revealed in the following testimony: "If you would take the baghouse and block off the outlet and all of the blowout doors, and put a pressure of 1.6 on the inlet, the baghouse would then have an internal pressure equal to the 1.6 at the outlet." Mellen agreed with this conclusion, but disagreed that the contract required him to assume the closing off of the outlet and the sealing of the blowout doors. Mellen is correct. The baghouse would cease being a baghouse under those conditions. It was intended to filter a moving stream of air. Treating it like a metal balloon plainly cannot simulate "operating" conditions.

■ Defendant nevertheless argues that the combination of references to "positive pressure," Section 3.5.3, and the baghouse, contained in section 4.4.1, demonstrate that the baghouse itself was to operate at an internal pressure in the range of .6 to 1.6 psi. That contention plainly does not succeed. As Mellen explained without contradiction from government witnesses, positive pressure is pressure that pushes into a chamber. The converse would be negative pressure drawing air or gas out. Section 4.4.1 does no more

Q And is that not exactly what Mr. Mellen is proposing on Exhibit 49 when he writes, "Completion date to be set after solution to letters dated March 15." That is your company's letter and his letter of March 22.

A Although there is no date set forth.

. . . .

Q I agree. You are leaving that open for now?

A Yes.

Q And that is what Mr. Mellen was suggesting, correct? That we leave it open. It says, "To be set after solution to letters, March 15 and March 22."

A Okay.

Q So would it be fair to say that you and Mr. Mellen had reached a meeting of the minds. "Let's resolve the pressure issue, and then, we will talk about a delivery schedule for the completion."

A Yes.

Q All right. Just so that it is clear, sir, when you sent the letter of April 11, at that point in time of the process, sir, you were not telling Mr. Mellen to come down and finish before we resolved the pressure issue, were you?

A No, I was not.

than identify the external source as upstream from the baghouse.

The government, for its part, never explained from an engineering standpoint why an inlet gas operating pressure up to 1.6 psi would mean that the pressure inside the machine would also be 1.6 psig. Mellen's explanation to the contrary seemed credible to the court, and is supported by his many years of practical experience. He has built hundreds of baghouses using similar data. His contention that the pressure would drop dramatically in the baghouse itself was supported by plaintiff's expert witness, Mark Holland, an architect specialized in designing for environmental considerations. Holland has had experience writing specifications for baghouses.

The government's expert, William Ayers, on the other hand, has limited experience designing baghouses and none in building them. If crediting defendant's position on internal pressure required the adoption and explanation of a theory of the case incorporating Ayers's calculations, the court would be at a complete loss. Defendant in general, and Ayers in particular, had the obligation to explain why Airprep's device did not meet the specifications. They failed.

Ayers's testimony was virtually incomprehensible. He switched back and forth between ultimate stress, material stress, point of failure, internal pressure, design pressure, operating pressure, and other means of evaluating the expected performance of the Airprep design. Instead of presenting a coherent, comprehensive explanation of his own, he largely engaged in a piecemeal dissection of the calculations made by plaintiff's engineer, Zglobicki. At some points it was apparent he disagreed with the assumptions Zglobicki used. At other points he disagreed with Zglobicki's figures. He occasionally disagreed with the formulae used. At other points in his testimony, Ayers plainly agreed with Zglobicki as to particular formulae, figures, and assumptions. The court made a concerted effort to understand Ayers's argument and calculations while he was on the

stand, and has closely studied his testimony subsequently. One difficulty is that Ayers did not present his calculations as to the pressure-holding capacity of the baghouse until trial, making it more difficult for Airprep's counsel to cross-examine him. Airprep was handicapped in its cross-examination because Ayers's trial testimony went far beyond what he purported to have calculated by the time of his deposition. Although the court is left with the impression that Ayers understood the physics of what he was trying to explain, no coherent critique of the Airprep design came through. This failure is remarkable, given that Ayers himself testified that "any reasonably competent mechanical engineer" could build a baghouse.

The court has no confidence in Ayers's ultimate conclusion, reached on the stand, that the highest internal operating pressure the baghouse could tolerate would be .05 psi. He based it on simply too many unexplained choices of variables. More critically, Ayers's adamance that the baghouse would fail catastrophically at anything above .6 psi is impossible to square with other parts of his testimony. Ayers did his June 5 repair calculations on the assumption that he could bring the baghouse into compliance with the specifications. This assumption is fundamentally inconsistent with the bulk of his testimony, namely that the problem with the baghouse was its inability to hold pressure. None of the repairs he proposed affected the baghouse main chamber. The pressure holding shell would be used as plaintiff had delivered it. The structural modifications included in his calculations related to adding struts and braces to hold the baghouse up and strengthen its wind-loading capacity.[16]

Equally puzzling is his answer to the following question concerning Airprep's response to the show cause letter:

Q I guess that is just setting it up. Going to the next paragraph, "The maximum pressure expected will be 4.5 to 6 inches of water between .09 to .2 psig during operation. The .2 psig is within the allowable pressure drop. The 1 psig is stated in

16. Although Ayers apparently felt it was unnecessary to do calculations as to the pressure-holding capacity of the baghouse before making his repair estimate, he assumed that these calculations "would have been made long before they started to construct the unit."

paragraph 3.6.1." Do you agree with these conclusions?

A Yes, there is nothing wrong with those."

In sum, defendant did not establish either that its interpretation of section 3.5.3 was correct, or that a reasonable contractor, faced with an inlet gas pressure of .6 psi to 1.6 psi, would have any reason to think the operating pressure inside the baghouse would also be in that range. There is therefore no proof that the baghouse that Airprep was willing to deliver could not meet the actual contract requirements, as opposed to the new ones imposed by METC.[17]

What should Airprep have done once it appeared that METC was insisting on an improper contract construction? Airprep was obligated to comply with METC's reasonable contract instructions even if they were disputed. The opportunity for Airprep to challenge an interpretation or instruction it disagreed with would be in a subsequent request for an equitable adjustment. Here, the contractor in effect chose not to perform, and the issue is, was its nonperformance excused under the circumstances?

The court concludes that METC's interpretation of section 3.5.3 as requiring proof that the baghouse could tolerate internal pressures in a safety range two to four times an internal pressure of 1.6 psi constituted a cardinal change to the contract. Mellen testified, without contradiction, that accommodating METC's interpretation would have resulted in an entirely different baghouse. The old one could not have been retrofitted. A baghouse capable of tolerating pressures in the safety range Ayers wanted would have to have been cylindrical, would have used much thicker steel, and could not have been fabricated on site, as was the baghouse Airprep attempted to furnish. Such a baghouse would have been subject to ASME standards. Under those circumstances, METC's insistence on its view of the specifications and its rejection of the baghouse without accepting Airprep's assurances that it met performance requirements fundamentally changed the parties' bargain. Airprep's inability or unwillingness to give METC the assurances that it wanted were not a breach of contract.

### CONCLUSION

Defendant has failed to carry its burden of justifying the default termination. Airprep is thus entitled to damages as if the contract had been terminated for the government's convenience. Although Airprep submitted a cost claim to the government, the only recoverable damages it sought were the contract balance. No further proof was submitted at trial, other than Mellen's generalized assertions that Airprep was entitled to the contract balance. The court finds that the plaintiff is entitled to $81,390.00, the amount it invoiced the government upon the February delivery. As explained above, Airprep was obligated to furnish considerably more material and labor. The court finds that invoice is the best evidence the court has as to the value of Airprep's work to that point.

Accordingly, the Clerk is directed to enter judgment for plaintiff in the amount of $81,-390.00, plus interest pursuant to the Contract Disputes Act from December 15, 1989. Costs to plaintiff.

---

17. METC never sought to test the pressure-holding capacity of the baghouse. Mellen explained that the integrity of the structure itself could have been tested without the control panel and by using an artificial air source.