George T. JOHNSON and Harvey Case, doing business as J. C. Company, a co-partnership

v.

The UNITED STATES.

No. 216–77.

United States Court of Claims.

March 19, 1980.

Bruce T. Rinker, Seattle, Wash., for plaintiff; Stuart G. Oles, Seattle, Wash., attorney of record. Oles, Morrison, Rinker, Stanislaw & Ashbaugh, Seattle, Wash., of counsel.

Stephen G. Anderson, Washington, D. C., with whom was Asst. Atty. Gen., Alice Daniel, Washington, D. C., for defendant. Albert R. Wall, Hillsboro, Or., of counsel.

Before KASHIWA, KUNZIG and BENNETT, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

### PER CURIAM:

Plaintiff seeks reversal of two decisions of the Agriculture Board of Contract Appeals, one approving the contracting officer's default termination of plaintiff's contract and the second determining the quantity of rock borrow excavated under the contract. This case is before us on defendant's request for review of the recommended decision submitted by Trial Judge Willi. The trial judge concluded that the case should be remanded, pursuant to Rule 149, to the Agriculture Board of Contract Appeals for further proceedings in conformity with his report.

Upon consideration of the briefs and oral arguments of counsel, we agree with the trial judge's conclusion and adopt his report and conclusion, as modified, as the opinion of this court.

It is, therefore, concluded that plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment are denied. The case is remanded, pursuant to Rule 149, to the Agriculture Board of Contract Appeals for further proceedings in conformity with the trial judge's report, as modified.

The trial judge's report, as modified, follows:

### OPINION *

WILLI, Trial Judge: By this suit plaintiff, a construction partnership, seeks reversal of two decisions of the Agriculture Board of Contract Appeals (the Board), the first [1] approving the contracting officer's default termination of plaintiff's contract to build 2.4 miles of road to a recreational site in the South Tongass National Forest in southeastern Alaska and the second [2] de-

termining the total quantity of excavated rock borrow for which the partnership was entitled to be paid under the contract. The issues of liquidated damages and excess reprocurement costs associated with the default termination are not involved in this proceeding.

The contract, allotting 300 days for completion, was awarded September 3, 1968. It contained the standard clauses governing changes, changed conditions, suspension of work, disputes, default termination and termination for convenience. It also included a provision authorizing progress payments to be made monthly or, in the discretion of the contracting officer, more frequently.

The work was defined by 21 separate items, each expressed in terms of an estimated [3] multiple of a specified unit of measurement. A bid price was submitted for each of those items with the sum of them representing the bid for the job. Plaintiff's bid of $483,732.97, which it reconfirmed prior to award, was not only the lowest received but was 18 percent below the Government's estimate.

Foremost among the 21 enumerated items of work was that relating to excavation and placement of rock borrow. The invitation estimated that item at 40,123 cubic yards on which plaintiff bid $4.94 per yard or a total of $198,207.62. Thus, this item alone accounted for more than 40 percent of plaintiff's entire bid price.

Two portions of the contract dealt with the measurement of excavation quantities.

Section 3.8 of the General Specifications, entitled Measurement of Quantities, directs that: "In computing volume of excavation * * * the average [e]nd· area method shall be used."

As it first appeared in the Invitation For Bids, Item 51—Excavation and Embank-

---

* The opinion and recommended conclusion of law are submitted pursuant to Rule 166(c). The necessary facts are stated in the opinion.

1. J. C. Company, AGBCA No. 306, 76–1 BCA ¶ 11,700.

2. J. C. Company, AGBCA No. 306, 76–2 BCA ¶ 12,175.

3. The contract authorized an adjustment in unit price in the event of a deviation greater than 25 percent from the estimated quantity of " * * * any major item."

ment of the Construction Specifications included section 4.1, entitled *Method of Measurement*, providing:

> The yardage to be paid for shall be the number of cubic yards measured in *original* position, after clearing and grubbing and any pioneer road construction have been completed, and computed by average end area method, of material acceptably excavated as prescribed. * * * [Emphasis added.]
>
> *  *  *  *  *  *
>
> In cases where it is impossible or impractical to measure the yardage in accordance with 4.1 above, measurement may be made in vehicles when approved in writing by the engineer. The yardage measured shall be of uncompacted material measured in the vehicle at the point of delivery. The yardage measured shall be reduced by an estimated swell factor mutually agreed upon in writing by the government and the contractor prior to excavation. The measurement shall include only the yardage of materials placed as shown on the plans or as directed by the engineer.

With the fact of the action but not the reason for it communicated to the plaintiff prior to its bid, an addendum to the Invitation For Bids was issued eliminating the italicized word from the language quoted above.

Differing interpretations on the part of the plaintiff and the contracting officer regarding the effect of the above amendment precipitated the present controversy, the latter maintaining that the average end area method remained the means of measuring excavated rock borrow for payment purposes while plaintiff insisted that the amendment displaced that method in favor of volumetric measurement in the rock buggies that hauled the material from the quarry site to its ultimate destination in the roadbed.

The work done in the fall of 1968, before the winter shutdown authorized by the contracting officer to be effective November 27, 1968, proceeded without incident. It was largely preparatory in nature and involved no significant excavation of rock borrow. It was after the resumption of work in May 1969, that the rock borrow phase of the work became active.

The operative facts, as found by the Board,[4] are not disputed in the present proceeding.

In the course of performance plaintiff removed a total of 7,410 loads of loose rock, averaging 15 cubic yards each in total volume, from the borrow areas and placed that material in the roadbed. On account of that work, plaintiff received the following

---

4. Plaintiff challenges only two Board determinations that it characterizes as factual. Neither, however, presents a genuine question of substantial evidence. The first relates to the Board's statement that: "We are not able to conclude from the record before us that the contractor's financial status resulted from actions of the Government." 76–1 BCA, *supra* note 1, at 55,796. While in isolation this language expresses a factual conclusion, when the sentence is read in context it becomes obvious that the intended conclusion is actually one of law. The quoted sentence represents the Board's rejection of plaintiff's contention that its obligation to perform was excused by the financial pinch that resulted from the inadequate progress payments that the contracting officer authorized for excavated rock borrow, the Board's rationale being that financial hardship from that quarter, however severe, cannot excuse performance because the Government's curtailment of progress payments, though ultimately deemed incorrect, was founded on a tenable construction of the contract at the time. Thus, the entire substance of the challenged conclusion is legal, not factual.

Plaintiff's second challenge is to the Board's 10th numbered finding of fact (76–1 BCA, *supra* note 1, at 55,790) which is conceded in the present proceeding; was totally based on a text reference that was not a part of the record before the Board. The defendant would validate this action on the theory that the opinion-oriented material in question was judicially noticeable by the Board. Defendant's Cross-Motion For Summary Judgment, p. 5, n.2. This is simply not so. Fed.R.Evid. 201(b), 28 U.S.C.A. That provision of the Federal Rules of Evidence clearly applied to the proceedings before the Board in this cause. Rule 18(h), Rules of the Agriculture Board of Contract Appeals. 7 C.F.R. § 24.21 at 356 (as of Jan. 1, 1976). In this particular, therefore, the question is altogether one of admissibility, not substantiality of the evidence.

numbered progress payments covering the quantities and periods indicated:

| Period | No. | Yardage | Amount |
|---|---|---|---|
| May 12–31, 1969 | 2 | 5,800 | $28,652.00 |
| June 1–July 12, 1969 | 3 | 2,300 | 11,362.00 |
| July 13–Aug. 2, 1969 | 4 | 28,769 | 142,118.86 |
| Aug. 3–Sept. 8, 1969 | 5 | 14,831 | 73,265.14 |
| Sept. 7–Oct. 4, 1969 | 6 | 1,424 | 7,034.56 |
| Oct. 6–Nov. 1, 1969 | 7 | 8,447 | 41,728.18 |
| Nov. 2–Nov. 19, 1969 | 8 | 150 | 741.00 |
| | Total | 61,721 | $304,901.74 |

In June 1969, after receiving the first of the progress payments listed above, the plaintiff realized that the contracting officer was calculating borrow quantities according to the average end area method instead of by reference to truckload volume. Believing that the contracting officer's method was understating the volume of rock involved, the plaintiff informally [5] protested the procedure. To advocate its position, plaintiff enlisted the assistance of a consulting engineer who met with the contracting officer at the job site on July 24, 1969. As a result of that meeting, the Board found,[6] " * * * a compromise, solely *for purposes of progress payments*, was agreed upon whereby *such payments were made on the basis of* 11½ *cubic yards per vehicle*. This was applied only to Pay Estimate No. 4 * * *. However, the Contracting Officer declined to use vehicle measure for purposes of final quantities and payments." *J. C. Company*, AGBCA

No. 306, 76–1 BCA at 55,790 (Emphasis added.)

As shown in the above table, plaintiff's progress payment number five was based on the excavation and usage of 14,831 yards of rock borrow for the period August 3–September 8, 1969. The Board found that before making the next progress payment the contracting officer, adhering to his preference for measurement by the average end area method (rather than vehicle load count), concluded that the yardage reflected in payment number four was excessive and, accordingly, directed that payment number six be reduced from the actual yardage for the period, September 7–October 4, 1969, in order to recoup what he perceived to be the earlier excess. 76–1 BCA, *supra* at 55,790. The payment was consequently based on only 1,424 yards of material.[7]

In addition to the above-described reduction, the contracting officer directed that the yardage used for purposes of progress payment number seven be reduced from 14,952 to 8,447 in order to eliminate for that period all borrow hauled from one of the pits that was used. The reason for the exclusion was that plaintiff had not complied with an order directing it to trim and dress that pit for final measurement, i. e., measurement of excavated material by the average end area method. The reduction in volume reduced payment number seven by approximately $32,000.

---

**5.** At no time did plaintiff challenge the computation of estimated borrow quantities by filing a claim pursuant to the disputes clause.

**6.** In finding, as it did, that the compromise agreement covered volume measurement for rock borrow progress payments generally, the Board necessarily chose not to credit the only evidence in the record indicating that the scope of the undertaking was less broad; a letter of September 4, 1969 to plaintiff from the contracting officer in which he contended that the agreement covered only the fourth progress payment. Under the Board's rules that letter, although not formally introduced at the hearing (and not mentioned by the contracting officer in the course of his testimony, which did not otherwise refer to the agreement) became a part of the evidence by virtue of its inclusion in the appeal file and the absence of affirmative objection to it by plaintiff. Rule 5(d), 7 C.F.R. § 24.21 at 353 (as of Jan. 1, 1976). The letter

was referred to in the colloquy of counsel (Tr. 413). The engineer-consultant, on the other hand, testified that he understood the scope of the agreement to be as found by the Board. (Tr. 183–84).

**7.** The contemporaneous record of load count, a matter on which the parties are in agreement, was not made a part of the record. The transcript reflects, however, that partner Johnson was consulting that record when he testified that approximately 1,000 loads of material had been handled during the Sept. 7–Oct. 4 period. (Tr. 76–77). Per the compromise agreement on payload volume, this would mean that during the period plaintiff handled approximately 11,-500 yards of material rather than the 1,424 yards for which it received a progress payment. That difference, at the contract price of $4.94 per yard, represents a progress payment reduction of approximately $50,000.

Plaintiff's contention is, as it was before the Board, that it was the financial hardship resulting from the substantial and unwarranted curtailment of progress payments for rock borrow that rendered it unable to resume work when ordered to do so by the contracting officer in April 1970, under threat of a termination for default. That threat materialized on April 13, 1970, when the contract was approximately 70 percent completed.

■ The standard default clause under which the contracting officer acted here included the usual language forbidding involuntary termination if " * * * [T]he delay in the completion of the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to, * * * acts of the Government in either its sovereign or contractual capacity * * *." An inability to continue the work, as a result of financial incapacity caused by the Government's wrongful failure to make progress payments falls well within the scope of the exculpatory provision. *National Eastern Corp. v. United States*, 201 Ct.Cl. 776, 792, 477 F.2d 1347, 1356 (1973); *Brooklyn & Queens Screen Mfg. Co. v. United States*, 97 Ct.Cl. 532 (1942). The validity of the Board's approval of the default termination therefore depends upon whether the plaintiff was indeed wrongfully deprived of progress payment money for rock borrow excavation and, if so, whether that deprivation in fact left it financially unable to continue performance.

As earlier explained, the contracting officer steadfastly adhered to the position that the amendment to the Invitation For Bids eliminating, without explanation, the word "original" did not alter the contract's command that excavated rock borrow be measured by the average end area method. Moreover, the record leaves no doubt that it was this abiding conviction that led him to order the drastic curtailment of progress

payments numbered six and seven. The Board, however, rejected this view and held that the loose volume reduced by the appropriate swell factor was correct, saying: "We believe the contractor was warranted in bidding on the basis of vehicle measure adjusted for swell and the deletion of the word 'original' from the first sentence of § 4.1 lends support to that approach to bidding. * * *." 76–1 BCA, *supra* at 55,798. The Board, therefore, determined that the method relied on by the Contracting Officer was incorrect—as were any orders to comply therewith, or any underpayments made as a result of the contractor's failure to comply with such erroneous orders. But the Board did not determine the volume of rock borrow for which the plaintiff should have been paid. Instead, noting the contract requirement, *supra*, that the parties agree on an estimated swell factor for purposes of payload measurement in vehicles, it remanded the question to the contracting officer " * * * for negotiation of such factor and for a determination of the total yardage measured in vehicles and the overrun of such yardage." 76–1 BCA, *supra* at 55,798.

Despite the fact that it left the quantification of compensable rock borrow unresolved and necessarily, therefore, the question of whether plaintiff was wrongfully subjected to a degree of financial hardship sufficient to disable it from continuing performance, the Board nonetheless approved the termination for default. It did so by application of a clearly erroneous legal theory, as will appear.

After acknowledging both that the Government's failure to make an agreed progress payment can justify an aggrieved contractor's refusal to continue performance [8] and that a Government delay in payment excuses contractor performance where it can be shown that resulting financial hardship rendered the contractor incapable of continuing, the Board announced that: " * * * the Government's refusal

---

8. At no point does the Board treat with the contracting officer's failure to observe the terms of the compromise agreement that it found that he had made "for purposes of progress payments" on rock borrow. Note 6, *supra*.

to pay on time will not establish a case of excusable delay for a contractor if there is a bona fide disagreement with respect to the amount owing. *Precision Tool Co., Inc.,* ASBCA No. 5048, 60–2 BCA ¶ 2739." 76–1 BCA, *supra* at 55,795. The Board then proceeded to apply its perception of *Precision Tool,* saying (76–1 BCA, *supra* at 55,796):

> We are not able to conclude from the record before us that the contractor's financial status resulted from actions of the Government. The genuine dispute between the parties as to the interpretation of the contract does not constitute an excusable reason for failure to perform. Progress payments were made by the Government on the basis of its interpretation of the contract. * * * *The Government was entitled to reduce the progress payments to the level paid because it believed its interpretation of the contract was legally justified.* [Emphasis added.]

Thus, it is seen that the Board in effect added the element of *mens rea* to the showing of causation that must be made by a contractor if he is to successfully avoid the sanction of termination on grounds of Government-imposed financial hardship. As the Board would have it, if the Government withholds payment because of a well-intentioned, albeit erroneous interpretation of the contract, any resulting impairment of the contractor's financial ability to proceed is irrelevant to his obligation to continue work.

While there may be situations where the Government's liability is dependent on its motive in withholding contract payments that are legally due,[9] avoidance of a default termination is not among them.

■ The exculpatory portion of the default clause does not condition contractor relief on a showing that he was deliberately wronged by an extrinsic force; only that his delay in completion was caused by circumstances that were beyond his control and not the product of his own fault or negligence. A well-intentioned but legally erroneous denial of essential funds by the Government meets the contractual requirements for relief as adequately as if the Government knew that the denial was legally impermissible at the time that it occurred. Attendant bad faith might well have other consequences but it would be superfluous to the contractor's rights under the exculpatory clause.

The issue in *Precision Tool, supra,* was the propriety of a default termination. The Board invalidated the action on the ground that performance was hampered, through no fault of the contractor, by untimely deliveries of essential material by the sole available source, an unsuccessful bidder on the contract in suit. In the course of reaching this holding the Board, by way of *obiter,* rejected one of the contractor's several additional contentions; this one being that it was rendered financially unable to continue work because of the Government's tardiness in honoring two claims for equitable adjustment that were ultimately settled by a Government payment totaling approximately $22,000. Without reference to supporting logic or precedent, the Board explained its rejection as follows (60–2 BCA, *supra* at 13,902):

> We conclude, however, that there was bona fide disagreement either as to the Government's liability under the contract, [or] as to the amount due. We also conclude that the Government's delay in making payment after termination was justified even though earlier payment might have enabled contractor to continue. We thus dispose of the first act of the Government alleged as an excuse.

In sum, *Precision Tool, supra,* does not validate the present Board's conclusion that inadequate progress payments for rock borrow cannot qualify as a source of disabling financial hardship under the exculpatory

---

9. For example, where the contractor contends that the Government's nonpayment for goods and services that it received so clearly lacked justification that it amounted to a Fifth Amendment taking of that property. *Acme Process* *Equip. Co. v. United States,* 171 Ct.Cl. 324, 370–72, 347 F.2d 509, 537–38 (1965), *rev'd on other grounds* 385 U.S. 138 (1966), *rehearing denied* 385 U.S. 1032, 87 S.Ct. 738, 17 L.Ed.2d 680 (1967).

clause because the Government did not knowingly underpay.

As earlier noted, the Board upheld the default termination without determining the extent to which, if at all, the plaintiff had been underpaid for rock borrow. In that initial opinion it did find, however,[10] that plaintiff had utilized a total of 7,410 rock buggy loads averaging a volume, in loose form, of 15 cubic yards each (*i. e.*, 111,150 cubic yards of loose rock altogether). Presumably, those findings fixed the parameters within which on remand the contracting officer and plaintiff were to negotiate[11] or otherwise arrive at a swell factor which, when applied to the gross yardage, would determine the pay quantity of rock borrow.

On June 23, 1976, the contracting officer rendered his decision on remand. In it he conformed to the Board's earlier determination that plaintiff had used 7,410 loads of rock borrow. He further determined, however, that the loads averaged 12.2 yards of loose rock each; this in contrast to the Board's previous finding of 15 yards. Thus, whereas the Board had found 111,150 cubic yards to be the total quantity of loose rock involved, the contracting officer determined that quantity as only 90,402 yards. Finally, the contracting officer concluded that the appropriate swell factor was 1.5, *i. e.*, 1½ yards of loose rocks was deemed to constitute 1 yard of rock borrow for pay purposes.

In proceeding in the manner that he did the contracting officer gave no explanation for his reduction of per-load volume of loose rock from the 15 yard figure found by the Board to the 12.2 yard figure that he used.

Plaintiff's position before the contracting officer on the matter of swell factor was, as it has in part remained here; that no adjustment whatever should be made on that account. That view proceeds from a strained and hyperliteral interpretation of that portion of the construction specifications authorizing measurement of rock bor-

row by the truckload rather than by the average end area method.

■ Plaintiff appealed the contracting officer's decision and in an opinion of October 1, 1976 the Board, at the Government's invitation, reverted to its previous findings concerning load count (7,410), load volume in loose form (15 cubic yards) and swell factor (1.8) and on that basis fixed the quantity of rock borrow at 61,750 cubic yards. *J. C. Company*, AGBCA No. 306, BCA ¶ 12,175. As previously discussed, note 4, *supra*, the sole predicate for the Board's swell factor of 1.8 is an extra-record text material that it made the subject of its 10th numbered finding of fact. 76–1 BCA, *supra* at 55,790. For the reasons set forth in footnote 4, *supra*, that material is neither judicially noticeable nor a part of the evidence in this proceeding. Since the element of swell factor is integral to a determination of a pay quantity that is derived from loose rock volume, the Board's determination of pay quantity cannot stand. Moreover, until that quantity is properly established, thereby fixing the amount, if any, by which plaintiff was underpaid, its eligibility for relief from default termination cannot be decided. Should further proceedings establish that plaintiff was, in fact, underpaid for rock borrow in a determinate amount it will then be necessary for the Board to determine whether, within the meaning of the exculpatory clause, plaintiff's ability to proceed was frustrated by financial hardship that resulted from the underpayment.

■ Neglecting the above analysis, the Board appears to have emphasized the contractor's failure to seek an equitable adjustment for rock borrow hauled in excess of 25 percent of the estimated quantity. The contract did give the contractor the right to demand such an equitable adjustment.

The defendant places emphasis on the Board's finding that the contracting officer was willing to *negotiate* an equitable adjustment for the excess rock borrow hauled.

---

**10.** Finding 4, 76–1 BCA, *supra* note 1, at 55,-789.

**11.** Construction Specifications, Item 51—Excavation and Embankment, § 4.1, *supra*.

Defendant, and the Board, would conclude that such a failure to seek an equitable adjustment prevents plaintiff from coming within the exculpatory portion of the default clause.

We agree the failure to seek such an equitable adjustment must be considered. However, we have held in *Davis v. United States*, 180 Ct.Cl. 20 (1967), that a contracting officer is entitled to *proof* of the contractor's claim for an equitable adjustment. Without such proof, the contractor may not complain of delay in reaching such an adjustment.

Plaintiff contends that it could not properly demand an equitable adjustment until after the completion of the project—not until that time could it have known and had proof of all its true costs—and any negotiations would have been meaningless. On remand the Board must reconsider this issue and determine whether, and to what extent, the contractor's failure to seek an equitable adjustment should influence the claim of financial frustration resulting from any underpayments.

## CONCLUSION

Plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment are denied and pursuant to Rule 149, the case is remanded to the Agriculture Board of Contract Appeals for further proceedings in conformity with this opinion. Further proceedings in this court are meanwhile suspended for a period of six (6) months from the date hereof. Pursuant to Rule 149(f), plaintiff's counsel is designated to advise the court by letter to the trial judge of the progress and status of the remand proceedings. Attention of counsel and the Board is also directed to Rule 150.