**MELVILLE ENERGY SYSTEMS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 282–89C.

United States Court of Federal Claims.

June 30, 1995.

William C. Herrmann, Red Bank, NJ, for plaintiff.

Donald E. Kinner, with whom were Asst. Atty. Gen. Frank W. Hunger, David M. Cohen, and Sharon Y. Eubanks, Washington, DC, for defendant. John Skarbek, U.S. Army Corps of Engineers, of counsel.

## OPINION

BRUGGINK, Judge.

This controversy arose out of a contract between plaintiff, Melville Energy Systems, Inc., ("Melville") and the United States Government, acting through the Army Corps of Engineers ("Corps"). Melville was to replace boilers in five mechanical rooms on McGuire Air Force Base in Wrightstown, New Jersey. The contract was default terminated after substantial work had been performed. Melville sues to recover the unpaid contract balance of $166,264.90, and approximately $147,199.37 more in contract price adjustments. Defendant has counterclaimed, seeking approximately $298,898 as reprocurement damages and the cost of repairs and maintenance it alleges were precipitated by Melville's abandonment of the work. However, because it has retained $166,264.90 in contract payments as a setoff of these costs, defendant requests a judgment of only $132,633.10.

Trial was conducted on April 4–7, 1995, in Trenton, New Jersey. After considering the evidence at trial, the court concludes that the Corps was justified in its decision to default terminate. Defendant has not, however, proven that it is entitled to affirmative relief. The court also concludes that Melville has not proven that it is entitled to further payment.

## FACTUAL BACKGROUND

The contract was awarded to Melville, a family-owned heating and mechanical contractor, on August 14, 1987. After amendment, the total amount of the contract award was $472,000. The Notice to Proceed was issued on September 30, 1987. Work was to be completed within one year.

Melville began to experience difficulties immediately upon commencing performance. Delays occurred due to disagreements with the Corps over the need to submit a written, temporary, heat plan, disagreements regarding the sequence of performance and the necessity of having the new boilers on site

prior to demolition of the old boilers, and Melville's difficulty in obtaining approval of its boiler submittals. These delays forced, Melville to change its Progress Schedule several times. Moreover, because of its performance difficulties, Melville failed to meet the September 30, 1988, completion date.

John Melville, son of James Melville, President of the company, testified that as of August 1988, the Corps was making an issue of Melville's failure to install cutoff valves between each module of the new boiler units. On December 28, 1988, the Contracting Officer ("CO") sent Melville a list of sixty deficient work items. In James Melville's response of January 25, 1989, he asserted that thirty-three of the items were completed and committed the company to complete a number of the remaining items by the end of the month. Some of the asserted deficiencies were disputed matters of contract interpretation.

On February 27, 1989, the Authorized Representative of the Contracting Officer ("ARCO"), Joseph Chupa, wrote Melville in response to a pay request. Mr. Chupa declined to make any further payment due to Melville's asserted failure to make progress in eliminating the list of deficiencies, including failure to install the cutoff valves. The Corps placed a $210,000 value on those deficiencies. The December 1988 deficiency list was attached to Mr. Chupa's letter.

April 7, 1989, was the last day that Melville performed work on the project. Six weeks later, on May 23, 1989, the Corps notified Melville of its belief that no further corrective work had been done to address the December 1988 deficiency list. The record contains no response to this letter from Melville. On September 7, 1989, the Corps sent Melville a cure notice, warning that failure to complete the work would result in termination for default. It is undisputed that Melville performed no work on the project after it received the cure notice.

On January 25, 1989, Melville submitted a claim to the CO seeking $312,464.27, as payment for the unpaid contract balance plus work it asserted to be extra-contractual. By decision of the CO, Melville was default terminated on October 17, 1989. The stated

ground for default was Melville's "failure to complete the remaining work." On December 1, 1989, the CO issued a second decision, this time asserting affirmative claims on behalf of the government arising out of reprocurement. Damages of $252,895 and credits of $46,003 were assessed against Melville.

## DISCUSSION

### Validity of the Default Termination

■ The court must begin with the undisputed fact that when Melville ceased work on the contract on April 7, 1989, its work was incomplete. Although the circumstances surrounding the Corps' forbearance to exercise its termination rights were not explored in depth at trial, the court finds that the contractor's decision not to work after April 7, 1989, constituted an apparent abandonment of the contract. Absent some defense, this abandonment gave the Corps ample grounds to terminate Melville for default. Although the legal issues were not clearly articulated in plaintiff's pretrial materials, the evidence adduced by Melville at trial was consistent with an argument that its non-performance was excused by government-caused delay and extra-contractual demands, as well as by defective government-supplied equipment. The same items that arguably excused performance are also the basis for Melville's claim for an equitable adjustment.

Melville was default terminated for "failure to complete the remaining work." The parties disagreed, however, about which items of work were incomplete. Joseph Sullivan, who at the time of default termination represented Melville's performance surety, testified for plaintiff as both a fact witness and as an expert. He negotiated with Jane Sobota, Chief of the Corps' Contract Administration Section in the Philadelphia District, concerning the precise quantum of work to be completed. The final list of deficiencies at the time of default consisted of approximately forty-six items. In negotiations over what the surety would be asked to complete, Ms. Sobota and Mr. Sullivan agreed to eliminate certain items from the final deficiency list and make adjustments in others for the purpose of pricing the reprocurement. As Ms.

Sobota testified, however, this agreement was conditioned on the surety's taking over the work. Because the surety did not complete the unfinished work, this condition was never satisfied.

Even if the court treats the shortened list of deficiencies as the only items indisputably unfinished, those items constitute a sufficient amount of incomplete work to support a default termination. Mr. Sullivan conceded that eight percent of the value of the contract was unperformed. In his view, this work consisted of such items as cleanup, reconnection of the Energy Management Control System ("EMCS"), installation of insulation in scattered places, provision of as-built drawings and certain testing documentation, and minor repairs. This is more than punch list work. Moreover, the court cannot accept Mr. Sullivan's eight percent figure. Mr. Sullivan's list of unfinished work fails to include at least three substantial items on which he and Ms. Sobota "agreed to disagree": installing the cutoff valves, cleaning soot out of the boiler system in Building 2829, and rerouting an air extractor.

The dispute over the cutoff valves arose toward the end of Melville's work on the contract. This dispute concerned whether the contract called for cutoff valves to be installed between each of the individual modules of the replacement boiler units. As Melville concedes, a detail note on drawing M–7 of the contract explicitly sets forth such a requirement. The uncontroverted evidence is that it was physically possible to do the work demanded. The court notes, moreover, that Melville was given the same option later afforded the follow-on contractor of installing cutoff valves between banks of three modules instead of between each individual module. Melville rejected this less onerous alternative, however, and simply chose not to install any cutoff valves. This was a choice it was not entitled to make. Melville's failure to comply with the government's demand to install these cutoff valves must be considered part of the grounds for termination. Absent certain defenses that will be considered below, Melville did not have the right to elect not to perform the work. It was obligated to proceed and rely on its remedy under the standard disputes clause in the contract if it wished to claim that insistence on literal compliance was unreasonable.

The cost to install even the reduced number of valves was not insubstantial, as discussed below. Thus, even if the soot clean out of Building 2829 and the rerouting of the air extractor are ignored, significantly more than eight percent of the work remained to be performed.

If Melville had been actively engaged in completing the work and seeking additional time to complete when it was terminated, the relative amount of the work remaining might have a bearing on the reasonableness of a default termination. However, Melville was not doing any work and expressed no desire to complete the project. The court finds that, absent some excuse, Melville simply abandoned the project leaving a significant amount of work unfinished.

■ Melville offers three defenses to the default termination, none of which is adequately established in the record. The first defense is that the order to install cutoff valves constituted a cardinal change to the contract. It did not. Even if the most reasonable interpretation of the contract as a whole is that cutoff valves were required only at the beginning and end of a bank of modules, the installation of valves on each module is not work substantially different in kind from the work called for by the contract. It may have been unnecessary; it may well have been wasteful. Nonetheless, it could be done without using extraordinary means and without changing the nature of the work. *See Air–A–Plane Corp. v. United States,* 187 Ct.Cl. 269, 275, 408 F.2d 1030, 1032–33 (1969); *Airprep Technology, Inc. v. United States,* 30 Fed.Cl. 488, 505 (1994). Although the contract called for Melville to devote an admittedly large effort to a seemingly pointless exercise, the solution to this dilemma was for Melville to comply and attempt to recover its costs.

Melville's second asserted defense to the default termination is that the Corps' failure to make progress payments rendered it financially unable to perform. This argument, however, fails for lack of proof. Although the record indicates that the Corps paid Melville approximately $305,000, it is poorly developed with respect to additional amounts sought by Melville but unpaid by the Corps. The only evidence of the value of unpaid contract work presented on plaintiff's behalf was developed by Mr. Sullivan. He testified that Melville is entitled to $128,505 of the $166,000 unpaid balance. There is no question that this is a significant amount of money. Even assuming Melville's entitlement to that amount, however, there was no evidence that the failure to pay constituted a breach of contract or that it prevented Melville from performing any further work. *See Johnson v. United States*, 223 Ct.Cl. 210, 217, 618 F.2d 751, 755 (1980); *Airprep Technology*, 30 Fed.Cl. at 504.

Melville's third defense to the default termination is excusable delay. In its complaint and its response to the defendant's motion for summary judgment, Melville advanced a number of arguments to support a delay claim. The contractor suggested it was delayed by the Corps' insistence on a proprietary specification for boilers, by restrictions on its access to the military base, by unreasonable interpretations of the contract specifications, and by delay in approving submittals. Some of these arguments were not advanced at trial. In the arguments that were advanced at trial, Melville offered no quantification of any government-caused delay that may have occurred prior to April 1989, when it ceased work on the contract, and no evidence at all that the Corps' actions precluded it from working beyond that time.

 The court concludes that the Corps was justified in terminating Melville for default. Under the contract, defendant is entitled to recover its reprocurement costs and other damages in connection with the contractor's default if they exceed retainage. Melville is entitled to payment for the value of the work it performed, less payment received, and less the Corps' reprocurement costs. In assessing the value of its work on the contract, Melville argues it is also entitled to be paid for work that was not required by the contract. The contractor can recover if it shows that the value of what it furnished, including change orders, is greater than what it has been paid, net of reprocurement costs.

## Government's Entitlement to Reprocurement Costs and Damages

 In the CO decision of December 1, 1989, the Corps' total damages were estimated to be $252,895. This figure was comprised of reprocurement costs, estimated to be $171,158, a "contingency factor" of $34,232, and administrative expenses of $47,505. In addition, the Corps seeks $46,003 in credits for two items required under Melville's contract but not completed.[1]

Ms. Sobota commissioned Corps personnel to estimate the cost of completing the work. She estimated the reprocurement cost of the forty-four items identified as needing completion or repair to be $155,740. Although this figure was adjusted, the court deems these adjustments immaterial. Because the surety could not give sufficient assurances that it would complete Melville's unfinished work, the Corps decided to reprocure on its own. Due to its relative importance, the work in Building 2829 proceeded first. The Corps' internal estimate for completion of Building 2829 was $98,000. When the Corps attempted to reprocure this part of the contract, however, it received an estimate from the sole-source contractor, Hutchinson Co., of $143,000.[2] For reasons not entirely clear, the Corps changed its estimate for finishing Building 2829 to a figure slightly higher than

---

1. These two items were the replacement of existing conduit (estimated value $160) and the submission of a temporary heat plan (estimated value $45,843).

2. Hutchinson and Melville were given the option of installing the cut-off valves in a less expensive way than that shown on the drawings. In the itemized breakout of the Hutchinson reprocurement contract on Building 2829, the cost assigned to the valves appears to have been $10,000. Building 2829 contained approximately one-third of the total boiler modules for the entire project.

Hutchinson's estimate. The contract to finish that building was ultimately awarded to Hutchinson for $143,000.

The court notes that although Hutchinson was to complete the work in Building 2829 within sixty days of the notice to proceed, its performance extended from February 1990 until August 1992. This appears to be a high cost and a long time for completing only one portion of the work left unfinished by Melville. Although defendant attempted to explain this by asserting that Building 2829 required a disproportionate amount of corrective work, the court is left with the impression that the Corps either acted hastily in awarding the contract to Hutchinson or made more adjustments to the original scope of work than were necessary to complete the building in accordance with the contract requirements.

After Hutchinson was hired to complete Building 2829, insufficient funding was left of the $166,264.90 "deobligated" from the original Melville contract to finish the remaining four buildings. Nonetheless, the Corps conducted a limited competitive solicitation and obtained three bids for the work on the remaining four buildings. These bids ranged from $89,874 from T.R. Mechanical, Inc., to $245,920 from Hutchinson. The difference in price between these two contractors was primarily the result of a difference in approach. While T.R. Mechanical, Inc., planned to wait until the summer to do most of the work, thereby avoiding the cost of providing temporary heat, Hutchinson's plan included temporary heat expenses. In any event, instead of reprocuring the unfinished work on the remaining four buildings, the Corps attempted to do some or all of the work with its own employees.

The Corps seeks reimbursement for the costs it incurred due to government employees having to work on the boilers. The court, however, did not admit as substantive evidence a document proffered by defendant purporting to reflect these costs. The witness offered to explain the relevant document did not have firsthand knowledge of how the costs were incurred, and the exhibit itself was far from self-explanatory.

For reasons set out below in connection with Melville's corresponding change order claim, defendant is not entitled to a $45,843 credit for Melville's failure to submit a temporary heat plan. The court is not convinced that such a submittal was one of Melville's contractual obligations. In addition, because defendant offered no evidence as to the $160 credit for "existing conduit," this amount is not recoverable. Defendant also failed to establish its claims for "contingent," administrative, and engineering costs.

Even if the amount paid to Hutchinson was excessive, the Corps' original estimate on Building 2829 and the low bid on the remaining four buildings together exceeded $195,-000. This sum does not include the contingency factor, administrative costs, or costs associated with the Corps' own efforts to finish the work, which were not the subject of any proof. The court is satisfied that, with better proof, defendant could have established that the unpaid contract balance of $166,269.90 was insufficient to cover either its reprocurement costs or, alternatively, the value of work left incomplete, whether or not reprocured.

The fact that reprocurement might have cost more than the contract balance, however, is not adequate proof of damages. Defendant has not furnished the court with either a well-supported summary figure or independent data from which the court could do a calculation. In sum, defendant did not meet its burden of proving an entitlement to affirmative relief in excess of the contract balance.

*Melville's Claim for Affirmative Relief*

Melville bore the burden of proving its entitlement to the contract balance and to additional amounts for work not called for by the contract. Its proof was no better than defendant's. With respect to the amount due under the unadjusted contract price, Melville relied exclusively on the analysis of Mr. Sullivan. He estimated that the value of the work performed was ninety-two percent of the total contract price of $472,000, or $434,-240. The contractor was paid $305,735, leaving, according to Melville, a balance due of $128,505. The court assigns little weight to that figure, however, because Mr. Sullivan

did not explain how that percentage was calculated. It is not based on a direct valuation of the work completed. Rather than attempt to prove directly the value of work done, he treated the original contract price as presumptively the correct amount to be paid, less his estimate of the work concededly unfinished.

Mr. Sullivan did attempt to quantify the value of the non-completed items. His starting point was the list of forty-six items attached to the CO's December 1, 1989, decision awarding the government an affirmative recovery on its damages claims against Melville. This list is included in tabular form in the Appendix. It reflects each item to be performed, the Corps' estimate of its contract value, and Mr. Sullivan's estimate or comment. "Off" refers to items of work Mr. Sullivan says he and Ms. Sobota agreed to remove from the list of deficiencies needing to be reprocured when they were negotiating the surety's takeover.

Mr. Sullivan estimated that the value of unfinished work was $18,515. Apparently this estimate excludes the value of items included in the reprocurement contract for Building 2829. His testimony indicates that the Corps' original estimate of $155,740 was for the remaining work on all five buildings, but that the final negotiations, reflected on the chart, occurred after the Hutchinson contract was awarded and thus excluded work to be done on Building 2829. This was also Ms. Sobota's testimony. As mentioned above, she also explained that the "agreement" was never consummated, as the surety chose not to perform. The Corps' estimate during this negotiation process for completion of the undisputed items of work, not including Building 2829, was $34,215. Both parties' figures are, in any event, less than eight percent of $472,000, or $35,760.

Moreover, Mr. Sullivan's summary of the "agreed" values of the reduced list is problematic because it does not include Building 2829 or disputed items. In addition, a number of items that were on the deficiency list were simply excluded through negotiation. The fact that the Corps gave up on getting

what it considered full performance does not mean that the original contract price should not be reduced for those items. Or, to put it affirmatively, it does not mean that the contractor gave value to that extent.

The disputed items as to which there was testimony from defendant were the credit for the temporary heat plan and the reprocurement cost of the cutoff valves.[3] As discussed above, Melville did not have the contractual right to simply refuse to install the cutoff valves. Thus, the contract balance must be reduced to reflect Melville's failure to perform this portion of the work. The simplest method of penalizing plaintiff for its failure to perform this work would be to give defendant its reprocurement cost. There is no single charge for all the valves, however, and the court is left to piece together a value.

Mr. Sullivan estimated the reasonable cost of doing this work for all five buildings at $43,200. Presumably this estimate reflected the less expensive approach that the Corps had earlier announced it would permit. The Corps estimated the cost at $65,000. The reprocurement as to Building 2829 included this repair. The contract unit price appears to be $10,000 for the twenty-nine modules in that building. It is not clear from the record whether the Corps had the valve installation in the remaining buildings done by a contractor, did the work itself, or left it undone. The court finds that a minimal reasonable value for the work left undone would be $43,200. The contract balance should be reduced by at least that amount, in addition to the value of items Melville concedes it did not complete.

Over a dozen items were taken off the "to do" list by agreement. Mr. Sullivan testified that these items had been performed or were not required under the contract or were not necessary because the alleged problem did not exist. On some items he did not recall the reason for exclusion. By and large his explanations went unrebutted. Collectively these items amount, according to the Corps' estimate of anticipated reprocurement expenses, to nearly $55,000. The fact that the

---

**3.** Because no evidence was offered in regard to the disputed work involving the air extractor in Building 2815, the court holds that this amount ($940) is not recoverable by the government.

Corps ultimately agreed to get along without some of these items, however, should not affect Melville's compensation. Melville should be paid only for the value of what it furnished. The difficulty with using the Corps' reprocurement estimate is that it was put forward for a different purpose. The court has no confidence that it can be used to ascertain the value of the work Melville performed.

In sum, Melville has not given the court a reliable figure for the value of the original contract work performed. The court will consider, nevertheless, Melville's claim that it is entitled to additional monies for equitable adjustments. If those claims were successful and the adjustments large enough, Melville might still be entitled to an affirmative recovery.

### 1. Temporary Heat Plan

■ Melville alleges that the Corps ordered it to prepare and deliver a plan detailing how it would provide temporary heat and hot water during its replacement of the existing boilers, even though the contract did not call for such a plan. As a result, Melville seeks an equitable adjustment to the contract price in the amount of $46,568. The defendant, for its part, alleges that a temporary heat plan was a required submittal pursuant to the contract specifications. Because Melville failed to satisfy this contractual obligation, defendant seeks a $45,843 credit to the contract price.

There is an obvious incompatibility in the predicates to these two assertions. Melville is claiming it did additional work, and the Corps takes the position it was never performed. The synthesis between these two views appears to be that Melville reluctantly did provide something it believed to constitute a temporary heat plan, but the Corps was not satisfied with it.

Although the Corps expected Melville to furnish temporary heat by using portable water heaters located outside of the existing boiler rooms,[4] James Melville testified that from the outset he planned to avoid this expense. Building 2829, the largest boiler room, supplied heat and hot water to occupied buildings. This boiler room had two existing boilers, only one of which was functioning at the time. Melville planned to remove the inoperative boiler and to generate temporary heat by using only the functioning boiler. According to Melville, by tuning up the functioning boiler and replacing its nozzles, this boiler alone could provide the heat and hot water that the combination of boilers had provided in the past.

By letter of September 27, 1987, Melville informed the Corps of its temporary heat proposal with respect to Building 2829. Although the letter made no mention of the other boiler rooms, James Melville explained at trial that his plan was to perform, during the winter months, the boiler replacement work in this building and in the boiler room that supplied heat and hot water to the unoccupied apartments. Then, during warm-weather months when no temporary heat was required, the remaining three boiler rooms would be completed. With this schedule, Melville planned to avoid the necessity of using external temporary heat. Although Corps personnel did not approve of this plan and believed it was inconsistent with the contract, defendant did not offer any proof at trial that the plan would not work.

Section 01513 of the contract required the contractor to provide temporary, space heat "when service is interrupted to row houses" for more than four hours at a time during the eight month period between October 1987 and May 1988. The drafters clearly assumed that the contractor would be unable to use the existing boilers to provide temporary heat. They envisioned that when the existing boilers were demolished, temporary heat and hot water would have to be supplied from an outside source until the new boiler units were in place. A literal reading of the provision, however, does not preclude Melville's plan. As discussed above, Melville devised a scheme to avoid such interruptions in excess of the four-hour maximum allowed

---

**4.** Heated water would be pumped into the apartment buildings through a temporary tie-in to the existing pipes.

by the contract. Melville's proposal was not contrary to the contract, and therefore the Corps is not entitled to a credit of $45,843 for Melville's failure to provide temporary heat.

The court also agrees with Melville that the contract did not require the submittal of a temporary heat plan. The contract simply called for a demolition/construction submittal reflecting the provision of temporary heat at appropriate times. Nonetheless, the court holds that no adjustment to the contract price or the performance period is warranted. Melville did not quantify costs or delays associated with preparing a temporary heat plan. The "plan" itself consisted of a letter explaining how Melville proposed to proceed. The implementation of that plan should have resulted in substantial savings over the method of providing temporary heat envisioned by the Corps. Consequently, Melville's claim for a $46,568 equitable adjustment for the temporary heat plan is denied.

### 2. Boiler Design Claim

In its complaint, Melville alleges that the Corps interfered with its performance by wrongfully requiring it to procure replacement boilers from a particular Hydrotherm supplier. According to Melville, the Corps' architectural engineer improperly denied approval of its first three boiler submittals in order to force it to use a specific supplier. For the excess costs and delay incurred as a result of this government interference, Melville seeks an equitable adjustment to the contract price in the amount of $22,490.

Melville failed to develop through its trial witnesses any facts connected to this allegation. With no evidence to support it, Melville's boiler design equitable adjustment claim must be rejected.

### 3. Stop Work Order Claims

■ According to Melville, the Corps' improper insistence upon a temporary heat plan, its unauthorized directives regarding the sequence of performance, and its denial of access to the worksite interfered with Melville's progress and ultimately contributed to government-ordered suspensions of work for which it is entitled to equitable adjustments in the amount of $52,441.

These equitable adjustment claims are premised on three ARCO letters that Melville interpreted as ordering the stoppage of all work until certain extra-contractual conditions were satisfied.

Two of these letters were written by William Jezik, the ARCO at the time, in response to a revised Construction Progress Chart submitted by Melville on February 24, 1988, and ultimately approved by the Corps on March 14, 1988. Although this progress chart indicated that on April 18, 1988, demolition work was to begin in Buildings 2829 and 2834, it also contained the notation: "materials needed on jobsite by April 25, 1988." Based upon this notation, it is not surprising that Mr. Jezik assumed Melville planned to have the new boilers on site by April 25. This assumption was expressed to Melville by letter of March 14, 1988, in which Mr. Jezik instructed the contractor that it could not begin demolition work on Building 2829 until the new boilers were on site. On May 18, 1988, Mr. Jezik reiterated to Melville that "no further demolition work" was to begin until the new boilers arrived.

Melville alleges that these two letters constituted a stop work order from Mr. Jezik that prevented it from making progress on the contract in accordance with its Construction Progress Chart. As a result of the delays occasioned by this interference, Melville seeks an equitable adjustment to the contract price in the amount of $4,816.

The third letter relied upon by Melville in support of its delay claims was written by Joseph Chupa, another ARCO on the project. According to this letter, dated May 18, 1988, Melville was instructed that "[u]nder no circumstances" was it to begin or start any type of work in the 2700 Area Buildings until it completed the work in Buildings 2829, 2834, and 2815. According to Mr. Chupa, the 2700 buildings would be released "upon final inspection and turnover of a mechanical room now under construction." In other words, Mr. Chupa ordered Melville not to begin any work in the two 2700 buildings until it had completed all work in the buildings in which it was currently working.

Melville alleges that this letter constituted a stop work order which prohibited it from commencing work in the 2700 buildings in accordance with its Construction Progress Chart. Because of the delays created by this improper interference with its access to the work site, Melville seeks an equitable adjustment to the contract price in the amount of $47,625.

It is likely that both Messrs Jezik and Chupa attempted to block Melville's access to additional buildings because of their concern that Melville's "temporary heat plan" would not work. As of July 1988, there had been substantial delay, and the 2700 buildings had yet to be started. Given the risks attendant upon Melville's proposal to avoid having to furnish heat for occupied buildings, the ARCOs' concerns were understandable. Moreover, even if the court found that Messrs Jezik and Chupa exceeded their authority under the circumstances, a finding the court does not make, such a finding would not aid Melville's claim for the following reasons: the Corps ultimately gave Melville access to the two 2700 buildings; Melville offered no evidence as to how temporary lack of access directly affected its ultimate completion date; the Corps did not exercise its contractual right to terminate Melville at the end of the performance period stated in the contract; and Melville abandoned the balance of the work in April 1989. The court concludes that Melville's equitable adjustment claims for delay fail for lack of proof.

### 4. Sooted Chimneys and Contaminated Fuel Oil

■ According to James and John Melville, sooted chimneys and contaminated fuel oil caused serious problems in the process of "starting-up" and operating the newly installed boiler systems. Both men testified that the existing chimneys, which were to be used for the new boiler exhaust emissions, were blocked with soot. John Melville testified that the blockage of the chimneys caused the burners to continually misfire. Both Melvilles testified that although they notified the Corps of this problem, it took no corrective action.

James and John Melville also testified that improper fuel oil supplied by the existing government tanks created a severe sludging problem with the newly installed boiler systems. Both men testified that despite their continual requests that the Corps change the fuel supply, no corrective action was taken other than an aborted attempt to supply oil from an auxiliary tank. In support of this contention, Melville presented Corps receipts for cleaning services related to unspecified fuel tanks on McGuire Air Force Base. These receipts purport to show that the tanks required cleaning because they contained the wrong type of fuel. Moreover, John Melville testified regarding a number of photographs allegedly depicting the sludge problems caused by the contaminated oil. These photographs clearly showed that the boiler filters were covered with sludge.

According to John Melville, Messrs Jezik and Chupa repeatedly told him that the sooting and sludging problems were Melville's problems. The Melvilles testified that as a result of these problems they were forced to continually remove and clean the boiler filters and burners. Mr. Sullivan testified that Melville had to take apart the boilers numerous times in order to clean soot out of the internal parts and to change filters and screens. For these allegedly extra-contractual cleaning expenses, Melville seeks an equitable adjustment to the contract price in the amount of $4,743.75.

Defendant argues that the sooting and sludging problems were not caused by contaminated fuel oil. It offered test results showing that the tanks that supplied oil to the boiler rooms in question contained the correct fuel oil. In addition, defendant offered receipts indicating that the correct oil was delivered to the tanks.

The court finds it unnecessary to resolve this dispute on the merits. The claim fails for lack of proof of damages. The only evidence regarding the amount of extra work performed was John Melville's generalized testimony that the company was forced to engage in cleaning work approximately forty times due to sludging and sooting problems. However, there was no particularity to the proof. No documentary evidence was of-

fered as to specific dates or boiler rooms or expenses incurred. Mr. Sullivan's "corroboration" of John Melville's testimony that $1,600 was a fair estimate for a single cleaning of the chimneys and breaching in one boiler room was not based on any direct information. Even assuming the work called for a contract adjustment, Melville did not satisfy its burden of proving damages.

### 5. Flooding Claim

■ In its complaint, Melville alleges that because of Corps negligence some of the work sites flooded when it rained. Melville contends that because the Corps refused to rectify this situation, it was forced to repeatedly pump out the flooded areas, incurring additional costs for overtime labor, equipment, and supplies. Melville seeks an equitable adjustment to the contract price in the amount of $6,938.62 for these expenses.

According to James Melville, "after any type of rain, the boiler rooms were flooded." Both Melvilles testified that this was caused by defective government sump pumps and clogged drains. According to John Melville, employees were "very careful" not to let debris fall into the drains, but they observed pre-existing debris in the drains prior to beginning work on the contract. Moreover, when they "snaked" the drain pipes they never found construction debris, but they did find roots, sludge, and dirt. On one occasion a sump pump malfunctioned and caused a sewer backup in one of the boiler rooms. James Melville testified that he informed base officials of these problems but that they failed to take any remedial measures. Both Melvilles explained that the company was forced to spend a great deal of time cleaning out these drains and pumping flood water out of the boiler rooms so that it could continue with the project. Although James Melville testified that the flooding delayed the performance of work called for by the contract, the company did not seek a time extension for this problem.

In an effort to quantify the damages incurred as a result of the flooding problem, John Melville testified that the company was forced to purchase several small pumps and expend a great deal of additional time removing water from the boiler rooms. He explained that there were eighteen rain days and another ten days lost due to inaccessible boiler rooms caused by sewage backups, but he did not specify which boiler rooms were involved and on which days the problems were encountered. Although John Melville did not personally prepare the $6,938.62 flood damages calculation, he testified that it was "fair."

Defendant argues that Melville's equitable adjustment claims should be rejected because Melville caused the flooding problems by failing to properly maintain the boiler rooms in which it was working. Both Jane Sobota and Mark Lazzaro testified that they observed construction debris floating on the top of puddles in the stairwells of the boiler rooms. Mr. Lazzaro also testified concerning two floods that occurred in Boiler Room 2834. According to Mr. Lazzaro, the first of these floods was caused by a combination of the contractor's removal of the check valve from the sump pump and its failure to properly replace the power panel fuses for the sump pump. Mr. Lazzaro did not offer any testimony as to the cause of the second flood.

Even if the court were to accept Melville's version of events, its claims must fail for lack of proof of damage. Melville has provided insufficient evidence to justify its $6,938.62 damages claim. It has offered no testimony explaining how this figure was calculated. It has offered no testimony detailing the specific instances of flooding and the remedial actions taken. Generalized testimony of a need to pump out flood waters is not sufficient to demonstrate the damages alleged. Consequently, this equitable adjustment claim is denied.

### 6. Other Claims

The same failing characterizes the balance of Melville's claims with respect to defective fuel oil, insulation, and asbestos removal. It is unnecessary to consider the merits of the claims because there was a complete failure of proof with respect to damages. John Melville's summary affirmations of the amounts sought in the complaint do not constitute proof. Melville is therefore not entitled to

have the contract balance increased due to any of its claimed equitable adjustments.

The question thus becomes: Did Melville prove that the value of the work it performed, less reprocurement costs, exceeded the $305,735 it was paid? The answer must be, "no." While the costs associated with reprocurement were too ill-defined to permit a recovery for defendant, Melville's proof of the values of its work was equally inadequate. Defendant bears the burden of proving reprocurement costs, while plaintiff has the burden of proving its entitlement to equitable adjustments. Neither burden was carried here. The court found defendant's evidence on reprocurement costs sufficiently unimpressive to justify rejecting defendant's claim for an affirmative recovery, but it is nonetheless satisfied that these costs were substantial. Balanced against what the court has to recognize were substantial reprocurement costs, the bits and pieces of proof offered by Melville do not constitute a coherent, defensible claim for additional payment. If Melville had presented a more compelling case regarding the value of the work it performed or its entitlement to equitable adjustments, then the adequacy of defendant's proof of reprocurement costs would become relevant. As it is, however, Melville's proof does not permit a reliable determination of whether it is entitled to any further payment.

## CONCLUSION

The court finds that the default termination was proper. Neither party, however, has established a right to monetary relief. Accordingly, both claims are denied. The Clerk is directed to enter judgment accordingly. No costs.

## APPENDIX

| Item | | Gov't est. | Sullivan est. or comment |
|---|---|---|---|
| 1. | Friction & barometric dampers | $ 60.00 | $ 60.00 |
| 2. | Tools for main. operation, clean'g | $ 200.00 | $ 200.00 |
| 3. | Install valves w/stem vertical or horizontal | $ 750.00 | $ 175.00 |
| 4. | Circulating pumps | $ 300.00 | $ 300.00 |
| 5. | Welded joints | $ 7,000.00 | Off |
| 6. | Clevis hangers | $ 250.00 | $ 100 |
| 7. | Vapor barrier | $ 200.00 | Off |
| 8. | Vapor barrier | $ 32,000.00 | Off |
| 9. | Ground wire | $ 1,750.00 | Off |
| 10. | Reconnect EMCS system | $ 17,000.00 | $ 5,000.00 |
| 11. | Repair damaged sequence, Bldg 2834 | $ 1,325 | Off |
| 12. | Domestic hot water, Bldg 2834 | $ 190.00 | Off |
| 13. | Leak at Holby valve | $ 130.00 | $ 130.00 |
| 14. | Relocate water line, Bldg 2743 | $ 190.00 | $ 95.00 |
| 15. | Leaks in fuel pumps, Bldg 2743 | $ 350.00 | Off |
| 16. | Leaks in domestic hot water | $ 35.00 | $ 35.00 |
| 17. | Install drain valve, Bldg 2743 | $ 75.00 | $ 75.00 |
| 18. | Oil filters, Bldgs 2735 and 2743 | $ 230.00 | Off |
| 19. | Replace foreign elbow | $ 25.00 | $ 25.00 |
| 20. | Clean sooting, Bldg 2829 | $ 130.00 | Disputed |
| 21. | Vibrations in tenant houses | $ 250.00 | Off |
| 22. | Air extractor, Bldg 2815 | $ 940.00 | $ 940.00 |
| 23. | Heating test | $ 1,500.00 | Off |
| 24. | Clean boilers and piping | $ 350.00 | $ 350.00 |
| 25. | Water balance flow meter | $ 1,200.00 | Off |
| 26. | Shop drawings | $ 7,500.00 | Off |
| 27. | As-built drawings | $ 7,500.00 | $ 7,500.00 |
| 28. | Isolation & relief valves | $ 65,000.00 | Disputed |
| 29. | Thermometers | $ 120.00 | $ 60.00 |
| 30. | Combustion & safety controls, etc. | $ 150.00 | $ 150.00 |
| 31. | Pressure gauge needle valve | $ 350.00 | $ 350.00 |
| 32. | Drain valves | $ 250.00 | $ 250.00 |
| 33. | Type 39 saddle | $ 1,000.00 | $ 1,000.00 |

| Item | Gov't est. | Sullivan est. or comment |
|---|---|---|
| 34. Hinged clean-outs, except Bldg 2829 | $ 1,800.00 | Off |
| 35. Pipe hangers | $ 2,000.00 | $ 500.00 |
| 36. Lateral support for expansion tanks | $ 660.00 | $ 100.00 |
| 37. Seal ends of insulation | $ 500.00 | $ 500.00 |
| 38. Provide lights | $ 150.00 | Off |
| 39. Panel labels | $ 150.00 | $ 150 |
| 40. Fuses | $ 100.00 | $ 30.00 |
| 41. Controls for automatic boiler operation | $ 550.00 | Off |
| 42. Separate conduit for outside thermostat | $ 250.00 | $ 250.00 |
| 43. Clean new equipment | $ 160.00 | $ 160.00 |
| 44. Submittals for isolators and preventors | $ 30.00 | $ 30.00 |
| 45. Credit for existing conduit | $ 160.00 | Disputed |
| 46. Credit for not providing temporary heat | $ 45,843.00 | Disputed |
| Totals: | $201,743.00 | $18,515.00 |